# UNITED STATES DISTRICT COURT
# EASTERN DISTRICT OF NEW YORK

**FILED**
IN CLERK'S OFFICE
U.S. DISTRICT COURT E.D.N.Y.

★ OCT 3 0 2007 ★

LONG ISLAND OFFICE

№ 03-CV-3243 (JFB) (ARL)
№ 03-CV-3466 (JFB) (ARL)

STATE OF NEW YORK, NEW YORK STATE RACING AND WAGERING BOARD, NEW YORK STATE DEPARTMENT OF ENVIRONMENTAL CONSERVATION, AND TOWN OF SOUTHAMPTON,

Plaintiffs,

VERSUS

THE SHINNECOCK INDIAN NATION, FREDERICK C. BESS, LANCE A. GUMBS, RANDALL KING, AND KAREN HUNTER,

Defendants.

---

TOWN OF SOUTHAMPTON,

Plaintiff,

VERSUS

THE SHINNECOCK TRIBE A/K/A THE SHINNECOCK INDIAN NATION, FREDERICK C. BESS, LANCE A. GUMBS, AND RANDALL KING,

Defendants.

---

MEMORANDUM AND ORDER
October 30, 2007

---

JOSEPH F. BIANCO, District Judge:

In the above-captioned consolidated actions, plaintiffs New York State ("New York"), the New York State Racing and Wagering Board (the "Board"), the New York State Department of Environmental Conservation (the "DEC") (collectively, the "State"), and the Town of Southampton (the "Town" or "Southampton") (collectively, the "plaintiffs") seek to permanently enjoin defendants, the Shinnecock Indian Nation (the "Shinnecock Nation" or the "Shinnecock Tribe" or the "Nation" or the "Tribe" or the

"Shinnecocks" or the "Shinnecock" or the "Shinnecock Indians"), and its tribal officials sued in their official capacity (collectively, the "defendants"), from constructing a casino and conducting certain gaming on a parcel of non-reservation property known as "Westwoods," which is situated in the western half of the Town in Suffolk County, New York ("Westwoods" or the "Westwoods land" or the "Westwoods site" or the "Westwoods parcel"). Plaintiffs have demonstrated that the defendants' actions and threatened actions with respect to the construction and operation of a Westwoods casino are not in compliance with New York anti-gaming laws and environmental laws, as well as the Southampton Town Code (the "Town Code"). However, because the Shinnecock Indian Nation is asserting immunity with respect to such laws, there are three main legal issues in the case: (1) whether aboriginal title to Westwoods held by the Shinnecock Indian Nation at the time of first European contact in 1640 has been extinguished; (2) whether, even if aboriginal title has not been extinguished, the Shinnecock Indian Nation is barred from asserting sovereignty at Westwoods, under the Supreme Court decision in *City of Sherrill v. Oneida Indian Nation,* 544 U.S. 197 (2005), because of the disruptive consequences that the construction and operation of a casino would have on the Town and the Suffolk County, New York ("Suffolk County") community; and (3) whether there is any legal basis to allow gambling at Westwoods in non-compliance with New York's anti-gaming laws if the proposed casino development is not within the parameters of federal law as set forth in the Indian Gaming Regulatory Act, 25 U.S.C. § 2701 *et seq*. ("IGRA"). This Memorandum and Order sets forth the Court's Findings of Fact and Conclusions of Law, pursuant to Rule 52(a) of the Federal Rules of Civil Procedure.

The Court conducted a lengthy and thorough bench trial, which lasted 30 days, and included over 20 witnesses, over 600 exhibits, and over 4,000 pages of transcripts. After carefully considering the evidence and the law, this Court concludes that the plaintiffs have demonstrated that they are entitled to a permanent injunction that prevents the development of a casino at Westwoods that is not in full compliance with New York and Town laws and regulations.[1]

The Court finds that there are three independent grounds for the Court's ruling in favor of plaintiffs. First, the evidence overwhelmingly demonstrated in a plain and unambiguous manner that aboriginal title held by the Shinnecock Indian Nation to the Westwoods land was extinguished in the 17th century. More specifically, a series of colonial era documents demonstrate in clear and unequivocal language that (1) the Shinnecock Indian Nation sold land, which included Westwoods, to non-Indians in the 17th century; (2) the land was subsequently acquired by Southampton; and (3) the sovereign authority of the Province of New York confirmed and ratified the ownership of the land by the Town, including a determination by New York Provincial Governor Richard Nicolls in 1666 in which he confirmed that "all the right and interest" in the land that included Westwoods "is belonging, doth and shall belong unto the town of Southampton" and promised to defend the Town in its peaceable enjoyment of such land "[a]gainst all other claims whatsoever." Although the defendants

---

[1] In a Memorandum and Order, dated November 7, 2005, the Court determined that the Shinnecock Indian Nation satisfied the federal common law standard for determining tribal existence and, therefore, that issue was not part of the trial.

attempt to point to certain aspects of the historical record in an effort to cast doubt on the meaning or validity of these transactions, the Court finds their arguments unavailing and concludes that this colonial-era extinguishment of aboriginal title to Westwoods is clear, unmistakable, and valid. Therefore, although there is no dispute that the Shinnecock Indian Nation currently owns and occupies Westwoods, the absence of current aboriginal title for the Westwoods land renders the Shinnecock Indian Nation subject to the application of New York and Town laws in the development of a casino on such land.

Second, even assuming *arguendo* that the Shinnecock Indian Nation has unextinguished aboriginal title to Westwoods, their proposed casino development is barred under the Supreme Court's decision in *Sherrill* because of the highly disruptive consequences the development and operation of a casino would have on the neighboring landowners, as well as the Town and the greater Suffolk County community. More specifically, based upon the evidence offered at trial, the Court concludes that the construction and operation of a casino at Westwoods would have severe disruptive consequences to the administration of governmental affairs, as well as the health, safety, and long-settled expectations of the residents of Southampton. For example, the substantial disruption to the transportation infrastructure in the Town and Suffolk County is undeniable. The evidence at trial demonstrated that the area in and around Southampton is already plagued with extremely high levels of traffic congestion in the summer months. The only rational conclusion to be drawn from the evidence is that, absent substantial infrastructure improvements (whose cost and feasibility are unknown), the addition of a casino to this already overburdened traffic system would be disastrous and undoubtedly would be highly disruptive to state and local governance and the settled expectations of landowners. In addition, the evidence demonstrated that the operation of a casino would have a multitude of other health and environmental impacts on neighboring landowners and the Town. Therefore, even if unextinguished aboriginal title currently existed, the Shinnecock Indian Nation's delayed assertion of sovereignty over this non-reservation land at Westwoods – after centuries of non-use of the land except for cutting timber and recreational functions – is barred by laches and other equitable principles under *Sherrill.*

A third independent ground exists for the permanent injunction in plaintiffs' favor. It is undisputed that the Shinnecock Indian Nation's planned gaming facility fails to comply with applicable New York law and that the proposed development does not fall within the confines of IGRA, which supplanted any federal common law right of tribes to conduct the type of unregulated gaming that the Shinnecock Indian Nation seeks to operate at Westwoods. The Shinnecock Indian Nation is not recognized by the federal government and Westwoods is not "Indian lands" as defined by the statute and, thus, the Shinnecock Indian Nation cannot utilize the safe-haven that IGRA provides from the otherwise applicable state anti-gaming laws. Therefore, the Shinnecock Indian Nation can only engage in gaming at Westwoods if it is in compliance with current New York gambling laws. Since the operation of a casino at Westwoods would violate New York anti-gaming laws, there is no legal basis for the Shinnecock Indian Nation to operate the casino.

In terms of the requested relief, defendants

argue that a permanent injunction is unwarranted because any harm from the proposed casino is speculative and not imminent. However, there is nothing speculative or remote about the project – the Shinnecock Indian Nation has a development agreement in place to build a 61,000 square foot ("sf.") casino at Westwoods on 15 acres (which defendants expect to have a capacity to hold 900 to 1,000 gaming machines and 60 table games), it has stated its intention to build the casino without being legally bound by government regulation of any type, and it began clearing trees at Westwoods in 2003 to start the project. Plaintiffs have satisfied the requirements for permanent injunctive relief, including a showing of irreparable harm, if the defendants are not prevented from building a casino in violation of New York anti-gaming and environmental laws, and Town zoning laws and other regulations.

Although the Shinnecock Indian Nation has emphasized to this Court during the trial (and the Court recognizes) the financial importance that the proposed casino has to the Shinnecock Indian Nation as it continues to face substantial economic hardship, this Court's proper role is not to address or remedy those economic hardships, but rather to examine the evidence under applicable law to determine whether the proposed casino development is legally permissible. For the reasons outlined briefly above and in detail in the Findings of Fact and Conclusions of Law that follow, the Court concludes that plaintiffs have demonstrated in an overwhelming fashion that they are entitled to a permanent injunction preventing the development of a casino at Westwoods that is not in compliance with New York and Town laws and regulations.

# I. BACKGROUND

## A. THE CONSOLIDATED ACTIONS

The lawsuit commenced by the Town against the Nation and its three Trustees (03-cv-3466) (the "Town action"), has been consolidated with the lawsuit commenced by New York, the Board, and the DEC against the Nation and its Trustees, as well as the Chairman of the Shinnecock Nation Gaming Authority (03-cv-3243) (the "State action"). Plaintiffs seek declaratory relief that the construction and operation of a casino at Westwoods is illegal under both New York and local law and, as a result of such violations and threatened violations, seek to permanently enjoin such activities. The Court will briefly summarize below the pleadings filed by each of the parties.

### (1) THE STATE COMPLAINT

The State complaint asserts five causes of action. The First Cause of Action alleges that any attempt by the defendants to build and operate a casino at Westwoods would violate New York anti-gaming laws and that such gaming would not be permitted under federal law (as set forth in IGRA) because, among other things, the Nation has not been recognized as a tribe by the Bureau of Indian Affairs (the "BIA"). (State Complaint, at ¶¶ 71-78.) The Second Cause of Action contends that defendants lack a Storm Water Pollution Prevention Plan ("SWPPP") and a Notice of Intent ("NOI") pursuant to a General State Pollutant Discharge Elimination System ("SPDES") permit for construction and operation of a casino and, therefore, cannot legally commence construction of the casino. (*Id.*, at ¶¶ 79-81.) The Third Cause of Action charges that, given the failure to apply for and obtain an SPDES permit under New

York environmental law, defendants cannot lawfully commence construction of a casino with a wastewater treatment facility that would discharge effluent into New York waters. (*Id.*, at ¶¶ 82-84.) The Fourth Cause of Action alleges that, because defendants failed to apply for and obtain a permit for a new well under New York environmental laws, defendants may not commence construction of a casino with an attendant new well having a pumping capacity exceeding forty-five gallons per minute. (*Id.*, at ¶¶ 85-87.) The Fifth Cause of Action asserts that, because the necessary environmental impact studies have not been conducted as required under the State Environment Quality Review Act ("SEQRA"), the DEC cannot issue the necessary permit to allow construction and operation of a casino facility. (*Id.*, at ¶¶ 88-90.) The State seeks a permanent injunction and a declaratory judgment in connection with these claims.

## (2) THE TOWN'S COMPLAINT

The Town also seeks declaratory relief and a permanent injunction. Specifically, the Town alleges that, in July 2003, defendants engaged in site preparation activities at Westwoods in connection with their previously-announced decision to develop a casino at that site. (Town's Complaint, at ¶¶ 12-15.) The Town contends that these construction activities were not preceded by any application for, or the issuance of, the requisite Town permits and approvals and, thus, such activities and threatened activities violate the Town Code. (*Id.*, at ¶ 16.) The First Cause of Action alleges that defendants violated Town Code § 330-184(I), which requires site plan approval or written permission from the Southampton Planning Board before any "regrading, clearing, tree removal or any other work in preparation of

future use of a site" may take place. (*Id.*, at ¶ 21.) According to the complaint, defendants did not apply or receive site plan approval before engaging in site preparation activities at Westwoods. (*Id.*, at ¶¶ 23.) The Second Cause of Action asserts that defendants' activities and/or threatened activities violate Town Code § 325-6(A), which is part of the Town's wetlands protection legislation and prohibits certain construction activities in a wetland area or within 200 feet of wetland boundaries in the absence of a Town-issued wetlands permit. (*Id.*, at ¶¶ 27-36.) In particular, it is alleged that defendants' site preparation activities at Westwoods qualify under this provision and defendants violated it by not obtaining the requisite permit. (*Id.*, at ¶¶ 31-34.) In short, the complaint alleges that "[d]efendants have refused to acknowledge, much less comply with Chapters 325 ["Wetlands"] and 330 ["Zoning"] of the Town Code, and otherwise have refused to recognize and acknowledge the Town's authority to regulate the uses of the lands within its borders." (*Id.*, at ¶ 36.)

## (3) DEFENDANTS' DEFENSES

Defendants make a number of admissions in their answers to the complaints.[2] Defendants admitted that the Tribe is not listed on the master list of federally-recognized Indian Tribes maintained by the federal government in the Federal Register. (Defs. Ans. to State's Complaint, at ¶ 43.) With respect to the alleged illegal gaming under New York law, defendants admitted that the Nation owns Westwoods and that the Nation intends "to engage in gaming activities in a building to be constructed on a portion of

---

[2] The admissions and defenses contained in the Answer to the State Complaint mirror those contained in the Answer to the Town Complaint.

the Westwoods Parcel. . . ." (*Id.*, at ¶¶ 46, 49.) Specifically, defendants admitted to a plan to construct a gaming facility in the summer of 2003 that would have the capacity to accommodate at least "900 to 1,000 gaming machines and 60 table games." (*Id.*, at ¶ 50.) Defendants also conceded that the Nation had not received an identification number issued by the Board or a license issued by the Town authorizing gaming at Westwoods, as required by New York gaming laws. (*Id.*, at ¶¶ 53-54.) With respect to the alleged violations of New York environmental laws, defendants admitted that they have not submitted any of the documents to the DEC for an environmental impact study in order to commence construction of a gaming facility at Westwoods under New York environmental laws, and that they also lacked the environmental and building permits and agreements required under Town zoning laws, Town fire code regulations, and New York environmental laws. (*Id.*, at ¶¶ 58- 59.)

Although a number of defenses are raised in defendants' answers to the complaints, their core defense is that New York and its political subdivisions, including Southampton, lack the power under the United States Constitution and federal common law to require the defendants to obtain any license, permit, or other form of approval to construct or operate a gaming facility at Westwoods. (Defs. Answer to State's Complaint, at 13, "Third Affirmative Defense"; *see also* Defs. Answer to Town's Complaint, at ¶¶ 8-9, "Third Affirmative Defense.")

## II. PROCEDURAL HISTORY

On June 29, 2003, the State commenced the State action in New York State Supreme Court, Suffolk County ("Suffolk County Supreme Court") to stop construction activities at the Westwood site. On that same date, the State obtained a temporary restraining order (a "TRO") signed by New York State Supreme Court Justice Edward D. Burke. On July 1, 2003, defendants removed the case to this Court and the matter was assigned to the Honorable Thomas C. Platt.

On July 14, 2003, Southampton filed the Town action in Suffolk County Supreme Court, also seeking to enjoin construction activities, based on defendants' alleged violation of the Town's zoning and land use laws. On that same date, New York State Supreme Court Justice James M. Catterson granted the Town's application for a TRO. Thereafter, on July 15, 2003, defendants removed the action to this Court and the matter was assigned to the Honorable Thomas C. Platt.

Shortly after removal of the State action, the State moved for remand. The State's motion for remand was denied by order dated July 29, 2003. *See New York v. Shinnecock Indian Nation,* 274 F. Supp. 2d 268, 271 (E.D.N.Y. 2003). The Town also moved to remand, but later agreed to withdraw its motion when the two actions were consolidated. (*See* Stipulation and Order, dated December 22, 2003.)

The State also moved this Court for a TRO and a preliminary injunction to halt construction of the casino. The Town joined in the State's motion. By Memorandum and Order dated August 29, 2003, the Court granted the preliminary injunction. *See New York v. Shinnecock Indian Nation,* 280 F. Supp. 2d 1, 10 (E.D.N.Y. 2003). The Court also stayed the action for a period of eighteen months to allow the BIA to decide the Nation's petition to the BIA for federal recognition. (*Id.*) Defendants appealed the

August 29, 2003 Memorandum and Order, and the Second Circuit remanded the case on November 18, 2003, stating that the district court should determine whether a preliminary injunction and stay was still warranted since the BIA could not address the Nations' petition for recognition within the eighteen months contemplated by the Court. *See New York v. Shinnecock Indian Nation*, No. 03-7996, at 1-2 (2d Cir. Nov. 26, 2003). Following the remand, on November 18, 2003, the Court conducted a conference in the State action in which the Town participated. At that conference, the Court lifted the stay, but continued the preliminary injunction pending a decision at trial. The Town action was also consolidated with the State action and the parties were ordered to proceed with discovery. (*See* Stipulation and Order, dated December 22, 2003.)

The parties filed motions for summary judgment and partial summary judgment on July 21, 2005. Defendants sought to dismiss the Town and State complaints on the grounds that the Nation is an Indian Tribe and is therefore entitled to tribal sovereign immunity. Plaintiffs sought partial summary judgment permanently enjoining defendants from operating a gaming facility, alleging that defendants lack the right to engage in tribal gaming under IGRA or under federal common law, and that any gaming was subject to New York gaming and environmental laws. The Town sought partial summary judgment on the grounds that Westwoods is not "Indian country," as defined at 18 U.S.C. § 1151, and thus is subject to state and local law, and that, in any event, the Nation no longer holds aboriginal title to Westwoods because such title was extinguished by sovereign act during the colonial era.

By Memorandum and Order, dated November 7, 2005, Judge Platt denied all motions for summary judgment and partial summary judgment, except that he granted the defendants' motion for summary judgment on the issue of whether the Nation is an Indian Tribe pursuant to the federal common law standard established in *Montoya v. United States*, 180 U.S. 261, 266 (1901) and *Golden Hill Paugussett Tribe of Indians v. Weicker*, 39 F.3d 51, 59 (2d Cir. 1994). *See New York v. Shinnecock Indian Nation*, 400 F. Supp. 2d 486, 491-92 (E.D.N.Y. 2005). Judge Platt held that "[t]he cases described above, beginning with *Montoya* and continuing to the present, establish a federal common law standard for determining tribal existence that the Shinnecock Indian plainly satisfies." *Id.* at 492. However, Judge Platt emphasized that "recognizing the Shinnecocks as a Tribe does not end the matter. The question remains as to what use Defendants may put the Westwoods property. . . ." *Id.* at 493. Judge Platt also found that the recent Supreme Court decision in *Sherrill* was relevant to considering "the extent of the impact of the 'disruptive' claims [of the defendants], the nature of the Indians' present titles and possibly the length of the delay and the question of laches, and appropriate remedies. These are factual and legal determinations which may only be resolved at a trial." *Id.* at 496. Judge Platt noted that "a remedy may also be disruptive in cases similar to the one at bar, where dispossession is not at issue and only neighboring landowners will be affected by the Indians' claims." *Id.* at 496 n.6 (citing *Sherrill*, 544 U.S. at 219-20).

### III. THE TRIAL

A bench trial commenced in this action before Judge Platt on October 4, 2006. On November 15, 2006, after six days of trial, the

case was re-assigned to the undersigned.[3] The bench trial resumed on December 4, 2006. On December 6, 2006, the State filed a motion for reconsideration of the denial of their motion for partial summary judgment. The Court denied the State's request that the trial be discontinued until the reconsideration motion was fully briefed and decided. Instead, the Court decided to continue with the trial and address the legal issues raised by the motion for reconsideration at the conclusion of the trial along with the other legal issues in the case. The final witness testified on April 17, 2007. The parties submitted their proposed findings of fact and conclusions of law on May 1 and May 2, 2007, for utilization by the Court in connection with this Memorandum and Order. Summations were heard on May 9 and May 10, 2007.

## IV. FINDINGS OF FACT[4]

### A. THE PARTIES

Plaintiff New York is a sovereign state with offices at the Capitol, in the City and County of Albany, New York. (Joint Pretrial Order Stipulation of Fact (hereinafter, "Stip.") No. 1.)[5] Plaintiff Board is an agency established within the Executive Branch of the government of New York, pursuant to Section 101 of the Racing, Pari-Mutuel Wagering and Breeding Law of the State of New York, and consists of three members appointed by the Governor of New York. (Stip. No. 2.) Plaintiff the DEC is an agency established within the Executive Branch of the government of New York, pursuant to New York Environmental Conservation Law article 3. (Stip. No. 3.)

Plaintiff Southampton is a municipal corporation organized and existing under the laws of New York, situated within Suffolk County and having an address at 116 Hampton Road, Southampton, New York. (Stip. No. 4.)

Defendant Shinnecock Indian Nation was held to be a tribe of Indians in this Court's Memorandum and Opinion dated November 7, 2005, and has offices on the Shinnecock Reservation in Southampton (the "Shinnecock Reservation"). (Stip. No. 5.) The Nation has not been acknowledged to be an Indian tribe by the BIA. (Stip. No. 9.) The Nation does not appear in the list of "tribal entities recognized and eligible for funding and services from the [BIA] by virtue of their status as Indian Tribes," as set forth at 70 Fed. Reg. 71, 194 (Nov. 25, 2005). (Stip. No. 10.) There exists no treaty between the Nation and

---

[3] Pursuant to Rule 63 of the Federal Rules of Civil Procedure, when the case was re-assigned due to Judge Platt being unable to proceed with the trial, the undersigned certified familiarity with the record and determined that the proceedings in the case could be completed without prejudice to the parties. (Trial Transcript (hereinafter, "Tr.") 855-57.) The Court also gave each party the option of recalling any witness who had already testified before Judge Platt. The parties agreed to recall two witnesses and consented to the Court relying on the transcript for the testimony of the other witnesses who had already testified.

[4] To the extent that any Finding of Fact reflects a legal conclusion, it shall be to that extent deemed a Conclusion of Law, and vice-versa.

[5] Although this Memorandum and Order makes specific reference to certain, but not all, of the individual factual stipulations set forth in the Joint Pre-Trial Order, each and all of those factual stipulations have been fully considered by the Court in connection with the Court's decision.

the United States. (Stip No. 11.) The relationship between the Nation and the government of New York (and its predecessors) predates the existence of the federal government. (Stip. No. 12.) The Nation currently occupies and is in possession of the Shinnecock Reservation, on which some members of the Nation reside. (Stip. No. 13.) The Shinnecock Reservation is generally described in the first sentence of Section 1 of Chapter 46 of the New York Laws of 1859, and does not include the property described below as Westwoods. (Stip. No. 14.)

Defendant James W. Eleazer, Jr. was, at the time the complaints in these consolidated actions were filed, an elected Trustee and official of the Nation, and was sued by the State in his official capacity only. (Stip. No. 6.) By Order of this Court dated April 17, 2007, Mr. Eleazer was dismissed from this action as a defendant, and Randall King was substituted as a party defendant in the place of Mr. Eleazer. Defendant Lance A. Gumbs was, at the time the complaints in these consolidated actions filed, and is now an elected Trustee and official of the Nation, and is being sued by the State in his official capacity only. (Stip. No. 7.) Defendant Frederick C. Bess was, at the time the complaints in these consolidated actions were filed, chairman of the Shinnecock Nation Casino at Westwoods Authority, and is now an elected Trustee of the Nation, and is being sued by the State in his official capacity only. (Stip. No. 8.) By Stipulation and Order of this Court dated March 21, 2007, Karen Hunter, who is currently Chairman of the Shinnecock Nation Gaming Authority (the "Gaming Authority"), formerly known as the Shinnecock Nation Casino at Westwoods Authority, was substituted as a party defendant in this action in the place of Phillip

D. Brown, V, who was the successor to defendant Mr. Bess as Chairman of the Gaming Authority.

## B. THE WESTWOODS PARCEL

The Shinnecock Tribe owns a parcel of land, commonly known as "Westwoods," which is approximately 80 acres in total area, located in the Hampton Bays area within the boundaries of the Town. (Stip. No. 15.) Westwoods is located approximately 85 miles east of New York City. (Stip. No. 37.)

Westwoods consists of three tax lots: (a) Suffolk County Tax Map, District No. 0900, Section 186, Block No. 2, Lot No. 38 ("Parcel A"); (b) Suffolk County Tax Map, District No. 0900, Section 187, Block No. 2, Lot No. 78 ("Parcel B"); and (c) Suffolk County Tax Map, District No. 0900, Section 207, Block No. 1, Lot No. 1 ("Parcel C"). (Stip. No. 16; D259,[6] at 4; D156 a, b, c, d.) Parcel A is property to the north of Newtown Road and south of Great Peconic Bay; this parcel is about 41.5 acres. Parcel B is property north of Sunrise Highway and south of Newtown Road; this parcel is about 36.7 acres. Parcel C is property south of Sunrise Highway and is about 2.0 acres. (D259 at 8; D264; D156d; Stip. No. 16; Tr. 3292-94.)

The Nation currently has fee simple title to Westwoods. (Stip. No. 17.) The Nation currently occupies and possesses Westwoods. (Stip. No. 18.) Westwoods is not part of any

---

[6] Exhibit numbers preceded by the letter D (e.g., D259) represent exhibits introduced by defendants; exhibit numbers preceded by the letter "T" represent exhibits introduced by the Town; exhibit numbers preceded by the letter "S" represent exhibits introduced by the State.

reservation established by New York.[7] (Stip. No. 20.) Westwoods does not appear in the records of the BIA as Indian fee land, the title to which is restricted against alienation in accordance with 25 U.S.C. § 177. (Stip. No. 24.) Westwoods is not currently under federal superintendence, as that term is used in connection with land that is a "dependent Indian community" for purposes of 18 U.S.C. § 1151(b). (Stip. No. 25.) Westwoods is not a "dependent Indian community" within the meaning of 18 U.S.C. § 1151. (Stip. No. 26.) Westwoods was not set aside by the federal government for the use of Indians as Indian land, as that term is used in determining whether land is a "dependent Indian community" for purposes of 18 U.S.C. § 1151(b). (Stip. No. 27.) There exists no express agreement between the Nation and the United States regarding Westwoods. (Stip. No. 28.). There exists in the Office of the Clerk of Suffolk County no recorded deed by the Nation, as grantor, conveying title to all or any part of Westwoods to anyone, nor is there a recorded deed conveying title to all or any part of Westwoods to the Nation, as grantee. (Stip. Nos. 29 and 30.)

There are other areas adjacent to, or in the vicinity of, Westwoods and the Town that are relevant to the instant litigation: (a) Canoe Place or Niamuck ("Canoe Place") is a name given to a place where Indians formerly carried their canoes between Shinnecock Bay and the Great Peconic Bay in what is now Southampton (Stip. No. 35); (b) Canoe Place is located at the approximate current site of the Shinnecock Canal in Southampton (Stip.

No. 36); (c) Cold Spring Pond is a body of water within the Town east of Canoe Place and is located approximately two miles east of the closest boundary of Westwoods (Stip. No. 38); (d) Quogue is a hamlet within Southampton to the west of Canoe Place and is located approximately 6-1/2 miles southwest of the closest boundary of Westwoods (Stip. No. 39); and (e) Seatuck is a place located at the southern end of the current western border of the Town (Stip No. 46), and is located at the current border between the Town of Brookhaven and Southampton. (Tr. 2580-81; T226.)

## C. WESTWOODS AT THE TIME OF THE FIRST EUROPEAN CONTACT

The Nation was in possession of the lands in and around Southampton when the first European settlers arrived in 1640. *See Shinnecock Indian Nation,* 400 F. Supp. 2d at 489. In fact, plaintiffs' expert agreed that the whole Town was owned by the Shinnecocks at the time of first European contact in 1640. (Tr. 1115-16.) Moreover, the history of the Town contained in its own records states that when the first settlers arrived "it appears that the whole extent of what is now the town of Southampton was owned by the Shinnecock tribe of Indians, who were divided into many small bands, and were living in villages that were without exception situated near the different creeks or branches of the bays. . . ." (D3, at II–III.) Thus, at the time of first European contact, Westwoods was possessed and owned by the Shinnecocks.

## D. THE SETTLEMENT AND FORMATION OF SOUTHAMPTON

By a Patent granted on April 20, 1635 by the Plymouth Company (the "Sterling Patent"), Lord William Alexander, the Earl of

---

[7] However, the above-referenced Suffolk County Tax Maps identify both Westwoods and the Shinnecock Reservation at Shinnecock Neck as "Shinnecock Indian Reservation." (D156a, b, c, d.)

Sterling, obtained undisputed title, in the name of the King of England, to the lands of Long Island. (James P. Lynch, *The Shinnecock and "Westwoods" in Southampton, New York: An Ethnohistorical Analysis*, Feb. 16, 2005 (T12),[8] at 18-20; Alexander von Gernet, *On the Authority of New York Colonial Governors to Decide on Matters Relating to Shinnecock Lands and the Town of Southampton*, June 29, 2006 (S62), at 6; T29, at 29.)

James Farrett was the duly appointed agent of the Earl of Sterling, who was granted the right and authority to convey lands within the Sterling Patent. (T12, at 21-22; S62, at 6; T32, at 50-51; Tr. 2441.) By deed dated April 17, 1640, Farrett granted free leave and liberty to four named English colonists and their associates to possess and improve a parcel of "eight miles square" of land on Long Island. (T12, at 22-23; S62, at 6; T33, at 45-47.) The deed, dated April 17, 1640, also granted to the four named English colonists and their associates the right to "make purchase (in theire owne names at theire owne leisure from any Indians that Inhabit or have lawfull right to any of the aforesaid land) all or any pt thereof, and thereby assure it to themselves and their heyres as theire Inhabitance for ever."[9] (T12, at 22-23; S62, at 6-7; T33, at

46.).

By a confirmation document dated July 7, 1640, Farrett specified the bounds of the aforesaid "eight miles square" of land that constituted the plantation that came to be known as Southampton (the "Southampton plantation"). (T33, at 49-50; T12, at 23-24; S62, at 7.) In particular, the confirmation of July 7, 1640 specified that the westerly bounds of the "eight miles square" of the Southampton plantation was "the place where the Indians drawe over their canoes out of the north bay over to the south side of the island," *i.e.*, Canoe Place. (T33, at 49; T12, at 23-24.) The lands constituting the Southampton plantation as of 1640 were thus situated exclusively to the east of Canoe Place. (T33, at 49-50; T12, at 24; Katherine A. Hermes, *Rebuttal Report to Alexander von Gernet's Report Entitled "On the Authority of New York Colonial Governors to Decide on Matters Relating to Shinnecock Lands and the Town of Southampton*," Aug. 21, 2006 (D91), at 5; Tr. 2441, 2175.)

On December 13, 1640, certain Shinnecock Indians, including tribal leadership, executed a deed that conveyed to English colonists all of the Shinnecock Tribe's right, title, and interest in lands bounded on the west by "the place where the Indians hayle over their cannoes out of the North bay to the south side of the Island," *i.e.*, Canoe Place. (the "1640 Deed") (S66, at 266-67; T12, at 31; T181, at 266-67; S62, at 7-8.) Only lands located to the east of Canoe Place are described in the 1640 Deed. (Stip. No. 21.)

---

[8] Pursuant to stipulation by the parties, the contents of the expert reports were deemed to have been read into the record in lieu of direct testimony. (Joint Pretrial Order, at 30.) Each party was permitted to conduct a direct examination of its expert witness in order to familiarize the Court with the opinions of the expert and the witness was then subjected to cross-examination.

[9] In this Memorandum and Order, unless otherwise noted in brackets, the Court has maintained the original spelling and grammar contained in these colonial era documents.

In or about 1644, the "Towne of Southampton" was accepted into the jurisdiction of the Colony of Connecticut, under terms and provisions set forth in a document entitled "Ye Combynation of Southampton Wth Har[t]ford." (T12, at 26-27; D95; Katherine A. Hermes, *Report on the History of Land Transactions Between the Colony of Connecticut and the Long Island Indian Tribes in the Seventeenth Century*, June 30, 2006 (D25), at 20; Tr. 2443.)

The terms of the "Ye Combynation of Southampton Wth Har[t]ford," provided, *inter alia*, that "if [u]pon vewe of such orders as are alreddy established by ye General Court for ye Jurisdiction of Connectecoate, there be found any difference therin from such as are also for ye present settled in ye Towne of Southampton, the said Towne shal ha[v]e libertie to regulate themsel[v]es acording as may be most sutable to their owne comforts and con[v]eniences in their own judgment, provided those orders made by them concerne themsel[v]es only and intrence not [u]pon ye interestes of others or ye Generall Combination of ye [u]nited Collonies, and are not cross to ye rule of riteousness. The like powre is also reser[v]ed [u]nto themsel[v]es for the future, for making of such orders as may concerne their Towne ocations." (D95, at 567; T12, at 27.)

By reason of these terms and provisions, Southampton, as an already-existing town, had the most liberal association with the Colony of Connecticut of all the towns and plantations under that colony's jurisdiction. (T12, at 27.) Defendants' expert witness, Katherine A. Hermes, testified that "ordinarily, when Connecticut founded towns, they were founded from scratch," but Southampton existed as a town prior to its combination with Connecticut and was permitted to keep the laws it had enacted prior to the combination so long as those laws were not in conflict with the interests of others or the laws of the United Colonies.[10] (Tr. 2456; D91, at 5.)

In 1650, the Connecticut General Court enacted an order that makes reference to an earlier order that prohibited individuals from buying any land from Indians, either directly or indirectly, under any pretense whatsoever (the "1650 Order"). (D46.) The 1650 Order remained the law of the Colony of Connecticut until 1663, when the Connecticut General Court enacted an order that replaced it. That successor order prohibited purchases of Indian land by individuals, except with allowance of the General Court. (D100; D25, at 20-21; Tr. 2453.) New England colonies other than Connecticut had similar laws and these laws were very widely published and understood. (D25, at 3.)

E. THE OGDEN AND TOPPING TRANSACTIONS INVOLVING WESTWOODS

As set forth below, in the 17th century, there were two transactions in which the Nation sold lands west of Canoe Place, including Westwoods, to non-Indians and the Town subsequently acquired those lands.

(1) THE OGDEN PURCHASE

As of May 12, 1659, the western boundary of Southampton was Canoe Place. (T12, at

---

[10] Although Professor Hermes testified about the concept of "personal jurisdiction" in the Colony of Connecticut, there is no order or law that provides that the Colony of Connecticut retained jurisdiction over its inhabitants regardless of where those inhabitants might travel. (Tr. 2593-94.)

24; T33, at 49-50; T181, at 266-67; D91, at 5.) On May 12, 1659, Sachem (Chief) Wyandanch and his son, on behalf of the Shinnecocks, conveyed the lands west of Canoe Place [west to Peaconock], to John Ogden, by an instrument that is referenced herein as the "Ogden Deed." This acquisition by Ogden became known as the "Quogue Purchase" or the "Ogden Purchase." (T50, at 162; T12, at 37; Tr. 872-76, 1067.)

At the time of the Quogue Purchase, Ogden was a Southampton proprietor who was also a magistrate to the Connecticut General Court. (T12, at 37; T59, at 70-71; Tr. 2557; D25, at 24; D136, at 314; D137, at 334.) Moreover, at that time, Sachem Wyandanch possessed political authority over the Shinnecocks, including authority to convey the lands west of Canoe Place to Ogden. (T12, at 33-36; Tr. 889-93, 895-896; T45, at 198; T46; T47, at 295; T49; S62, at 8 & n.9.) For example, on May 15, 1657, approximately two years before the Quogue Purchase, the Connecticut Colony General Court acknowledged that the Shinnecocks recognized the "Montacutt Sachem" (*i.e.*, Sachem Wyandanch) as their Sachem.[11] (T47,

at 295; Tr. 2541.)

The lands west of Canoe Place, conveyed by Sachem Wyandanch and his son to Ogden on May 12, 1659, were not part of the Colony of Connecticut at the time of that conveyance, as they were outside the territorial limits of Southampton. (T50, at 162; T12, at 24, 26, 32; T33, at 49-50; T34; D91, at 5; D95.) The lands conveyed by Sachem Wyandanch and his son to Ogden included Westwoods. (T12, at 37; D25, at 2, 24; T50, at 162; Tr. 876, 2474.) There is nothing in the historical record reflecting or suggesting that at any time prior to this litigation, the Shinnecock Tribe in any way disputed or contested Sachem Wyandanch's authority to act on their behalf.[12] (Tr. 896.)

Sachem Wyandanch died in 1659. (S69, at 57; S62, at 9 n.13.) By an order dated June 7, 1665, the Court of Sessions in Southold directed that the annual sum of twenty-five shillings per year, which was to be paid to "ye late Sachem Wyandance," pursuant to the

---

[11] On September 19, 1666, Thomas Halsey, a Southampton proprietor, (T181, at 266) reported that during a "time of the trouble in this towne of Southampton by reason of murder committed by the Indians," he witnessed Shinnecock Sachem Mandush cut up a turf of ground in Southampton and deliver it to Sachem Wyandanch, that he also saw Sachem Mandush and other Shinnecocks stroking Sachem Wyandanch on the back, and that since that time, Sachem Wyandanch "hath acted upon ye aforesaid Interest given to him as by letting and disposing of land at Quaquanantuck and else where. . . ." (T46, at 158.) On September 19, 1666, Thomas Saire (Sayre), a Southampton proprietor, (T181, at 266) reported that he had witnessed all that was reported by Halsey, except

for the delivery of turf by Sachem Mandush to Sachem Wyandanch, and also attested that "when Mandush gave up his right to Wyandanch and stroaked him on the back, Mandush alsoe told Wyandanch that now hee would bee all one dogge." (T46, at 158.)

[12] In its 1978 Memo (discussed *infra*), the Shinnecock Indian Nation referenced that the Ogden Deed was from "Shinnecock sachem Wiandance" without questioning Sachem Wyandanch's authority over the Shinnecocks. (T229, at page "I" of "Index to Appendices.") Prior to this litigation, the Shinnecock Tribe has never challenged or contested the validity of the conveyance by Sachem Wyandanch and his son, *i.e.*, the Quogue Purchase, to Ogden. (Tr. 896, 2544.)

terms of the Ogden Deed, (T50), should be made to the "sunk squaw daughter & heire to the said sachem." (T56, at 171; T57; T12, at 38.) Thus, one can infer from the order of June 7, 1665 that the Court of Sessions considered the Ogden Deed a valid, lawful, and effective instrument.[13]

Sometime between May 12, 1659 and February 2, 1663, Ogden sold the lands of the Quogue Purchase to John Scott. (T12, at 38; T53; S62, at 9 & n.11; Tr. 2472.) On February 2, 1663, Scott sold the lands of the Quogue Purchase to the proprietors of Southampton.[14] (T53, at 175-76; T66 at p. 54; S67, at 175-77; T12, at 38-39; S62, at 9; Tr. 2472.) Upon the sale of the lands of the Quogue Purchase by Scott to the proprietors of Southampton, Ogden confirmed in writing that "Wyandanch delivered unto him quiet seizen and possession of [those] lands . . . all the lands above recited in part of pay of the four hundred pounds the Shinecock Indians stood indebted, and the said Wyandanck bound for the said Indians."[15] (T53, at 176; T12, at 38.)

(2) THE TOPPING PURCHASE

As of April 10, 1662, the western

---

[13] It appears from the historical record that the conveyance to Ogden of lands west of Canoe Place was made in part payment of a fine imposed on the Shinnecocks by Connecticut Colony prior to September 8, 1657, by reason of the participation by certain Shinnecocks in an incident of arson. (T12, at 37-38; T52, at 231; T53; T54, at 180; T56; T57; T58, at 166-67; D183, at 62; Tr. 877-81, 883-85, 888.) This conclusion is supported by a number of evidentiary sources, including the following: (1) by an order issued by the Connecticut General Court on May 20, 1658, Ogden was one of four magistrates authorized and appointed to collect and distribute the proceeds of the arson fine imposed previously on the Shinnecocks (D57; Katherine A. Hermes, *Rebuttal Report Responding to 'The Shinnecock and 'Westwoods' in Southampton New York: An Ethnohistorical Analysis,' by James P. Lynch and 'Supplement to 'The Shinnecock and 'Westwoods' in Southampton, New York: An Ethnohistorical Analysis*, Aug. 21, 2006 (Revised for typographical corrections Sept. 28, 2006) (D32), at 22); (2) according to *The History and Archaeology of the Montauk Indians*, published in 1979 by the Suffolk County Archaeological Association, "[t]he land [of the Quogue Purchase] was sold in part payment of the fire money owed by Shinnecock Indians. Wyandanch had assumed the debt of 400 pounds and was paying in land – Shinnecock land for a Shinnecock debt." (T51, at 65; T12, at 37); and (3) in his treatise entitled *The Algonquian Peoples of Long Island From Earliest Times to 1700*, historian John Strong notes that "[John] Ogden had apparently purchased the debt from the Southampton officials who were unsuccessful in forcing payment from the Shinnecocks" prior to the Quogue Purchase. (T52, at 231.)

[14] References to "Quaganantick" in the May 1663 records of the Connecticut General Court suggest that Connecticut knew of Southampton's interest in lands west of Canoe Place. (D100, at 402; Tr. 2568-70.)

[15] During the trial of the 1667 Action in which Southampton sued Southold to, *inter alia*, confirm its title to certain lands west of Canoe Place and west of Westwoods (discussed *infra*), Ogden testified under oath, and once again confirmed how "hee came seized of the Land in question, that it was about the firemoney the Shinnacock Indyans being to pay a Certaine sume of money for the Mischiefe done by them. The Montauks Sachem being bound for them tooke the Land in question into hi[s] possession, and upon some Consideracion made it over to Mr. Ogdon, and Mr. Ogdon saith all his Right is conveyed to Southton," *i.e.*, Southampton. (D183, at 62.)

14

boundary of the Town was Canoe Place. (T12, at 24, 39-40; T58, at 167-68; D91, at 5.) On April 10, 1662, Sachem Wyandanch's political successor, Weany Sunk Squaw, and others, on behalf of the Shinnecocks, sold and conveyed lands west of Canoe Place to Thomas Topping. This transaction has become known as the "Topping Purchase."[16] (T191; T12, at 39-41; Tr. 896-98; T58, at 167-68; S62, at 9.) At the time of the Topping Purchase, Topping was a Southampton proprietor who was also a magistrate in the Connecticut General Court. (T12, at 39; T59, at 70-71; Tr. 2558; D25, at 24.)

The lands of the Topping Purchase were situated west of Canoe Place, and included the lands of the Quogue Purchase, including Westwoods. (T12, at 39-40; Tr. 899; T58, at 167-68; T191; D25, at 24-25; Tr. 2474.) The lands that were the subject of the Topping Purchase were not part of the Colony of Connecticut at the time of the Topping Purchase because they were situated outside the then-territorial limits of Southampton. (T12, at 24, 26, 32, 41; T33, at 49-50; T34, at 31; T58, at 167-68; T61; James P. Lynch, *Supplement to The Shinnecock and "Westwoods" in Southampton, New York: An Ethnohistorical Analysis*, June 29, 2005 (T13), at 12; D91, at 5; D95.) The western boundary of the lands identified in the Topping Purchase was "Seatuck," which is the modern-day border between Southampton and Brookhaven. (T12, at 39; Tr. 897-98; T58, at 168; T61; T191; Stip. No. 46.) The Topping Deed recited that the consideration for the Topping Purchase was "four score

fathoms of wampum, or other pay, equivelent." (T58, at 168; Tr. 899, 2183-84.)

By this purchase, Topping acquired the same rights to land west of Canoe Place that were included in the Ogden Purchase. (T12, at 41; S62, at 10; D91, at 7.) Whatever the reason for these overlapping deeds (which both included Westwoods), there is no question that these lands were sold by the Shinnecock Tribe and subsequent determinations by governors, discussed *infra*, confirmed such sale when issues arose related to these lands.[17]

## F. COLONIAL ERA DOCUMENTS AND EVENTS FOLLOWING THE OGDEN/TOPPING TRANSACTIONS

Following the Ogden and Topping transactions, there were several occasions in the 17th century during which issues relating to those lands were brought to the attention of the Governor of the Province of New York and, in one instance, a court. As set forth below, on each of these subsequent occasions, the prior sale of such land to Southampton was confirmed.

### (1) THE NICOLLS DETERMINATION

In a document dated September 17, 1666, several Shinnecocks recorded their "protest"

---

[16] In its 1978 Memo (discussed *infra*), the Shinnecock Indian Nation described the Topping Deed as being from "Weany Sunk squaw, female Shinnecock sachem." (T229, at page "i" of "Index to Appendices.")

[17] Plaintiffs made a number of challenges to the validity of the Ogden and Topping transactions during the trial. Although some of those challenges involve disputes over historical facts (such as whether Sachem Wyandanch had authority to act on behalf of the Shinnecock Tribe), the Court has addressed these issues in the Conclusions of Law, rather than the Findings of Fact, for purposes of organizational convenience.

over the 1662 sale of lands west of Canoe Place by Weany (Sunk Squaw) and other Shinnecocks to Captain Topping, claiming that they were "the true proprietors of the said lands." (T61; Tr. 2180-83.) In the 1666 protest document, the Shinnecock signatories sought to have Governor Richard Nicolls (whom they expressly acknowledge to be the "hon (bbl) & discreet Governor of this Island") determine that they were the "true proprietors" of the lands of the Topping Purchase, and that they should receive payment from the Southampton proprietors, for their conveyance, if so directed by Governor Nicolls.[18] (T61; Tr. 2180-83.)

Notwithstanding its use of the word "protest," the September 17, 1666 document declares the intention of its Shinnecock signatories to "impart and assigne all our said Interest in ye said lands [of the Topping Purchase] . . . unto our ancient and loving ffriends the Townes men of Southampton to them and their successors for ever." (T61; Tr. 2182.) Thus, by the protest document, the Shinnecock signatories were not seeking to unwind, invalidate, or reverse the conveyance

of land to Topping, or to obtain the lands of the Topping Purchase for themselves, but instead were merely seeking to be paid, *i.e.*, to receive the "four score fathom of wampum" recited as consideration in the Topping Deed. (T61; Tr. 2182-84.)

Subsequent to the September 17, 1666 protest document, and on October 3, 1666, Governor Nicolls issued a determination (the "Nicolls Determination"), in which he concluded and determined a "difference" between the "town of Southampton" and "Capt Thomas Topping." (T66, at 54-56; Tr. 2177-79.) In his determination, Governor Nicolls noted that he had reviewed several deeds, including the deed from "some of Shinecock Indians to Capt Topping," *i.e.*, the Topping Deed, and the deed from "John Scott to Southampton men," *i.e.*, the 1663 deed conveying the lands of the Quogue Purchase to Southampton. (T66, at 54; Tr. 2185-86; S62, at 10.) In the Nicolls Determination, Governor Nicolls determined, *inter alia*, that "all the right and interest that ye said Capt Thomas Topping" had by virtue of the Topping Deed "is belonging, doth and shall belong unto the town of Southampton . . . and their successors forever." (T66, at 54.)

By virtue of this language, Governor Nicolls determined that Southampton was the rightful owner of the lands of the Topping Purchase. (T66, at 54; T12, at 47-49; T13, at 13-15; S62, at 10-11.) In fact, in the Nicolls Determination, Governor Nicolls promised to defend the Town in its "peaceable enjoyment" of the lands of the Topping Purchase "[a]gainst all other claims whatsoever." (T66, at 55; T12, at 47-49; T13, at 13-15; Tr. 2564.)

Westwoods is located within the boundaries of the lands that were the subject of the Nicolls Determination. (Stip. No. 62.)

---

[18] This dispute also was recounted in the Town's records. Specifically, in the Introduction to the First Book of Records of the Town of Southampton, William S. Pelletreau, Southampton Town Clerk, wrote that the land within the bounds of the Town "was honorably purchased of its aboriginal owners" by the white settlers. (D3, at III.) Subsequently, in the Introduction to the Third Book of Records of the Town of Southampton, Pelletreau refers to the "settling of the western part of the town," and states, "[a]s has been stated in a former volume, that portion west of Canoe Place was purchased from its Aboriginal owners in 1666, and the controversy between the Town and Capt. Thomas Topping was decided by a reference to Richard Nicol, Governor of the Province." (D153, at II.)

At the time he issued the Nicolls Determination, Governor Nicolls was the prevailing sovereign authority within the Province of New York, which included Long Island. (T12, at 45-49; T13, at 13; T62; Tr. 1203-04, 2561, 2189-90; S62, at 19-25.) Governor Nicolls had been appointed the first English governor of the Province of New York on April 2, 1664, by virtue of a commission from the Duke of York. (S72; S62, at 19; Tr. 2189-90.) In the Nicolls Determination, Governor Nicolls ordered, *inter alia*, Southampton to pay to the "Indians (concerned to receive it)" the sum of "four score fathoms of wampum," which was precisely the same amount specified in the Topping Deed as consideration to be paid to the Shinnecocks for the lands of the Topping Purchase. (T66, at 55; T58, at 168; S62, at 10-11; Tr. 901, 2183-84.)

The Nicolls Determination does not explicitly or implicitly contest, challenge, or question in any way, the validity, legality, or effectiveness of either the Topping Deed or the deed from Scott to the Town, for the lands of the Quogue Purchase.[19] (T66; T13, at 14;

Tr. 2192-93, 2560.) Governor Nicolls possessed law-making authority to promulgate the Duke's Laws and he could settle disputes. (T12, at 45-46; S62, at 19-25; Tr. 2189-91; D91, at 11-12.) Governor Nicolls, under the Duke of York's proprietorship, also had the authority to address the question of Indian land purchases. (S62, at 20-24.) There is nothing in the historical record to suggest that the Shinnecock Tribe has ever challenged, in any way, the validity, legality, or effectiveness of the Nicolls Determination. (Tr. 908.)

Subsequent to, and as explicitly directed by the Nicolls Determination, by a written instrument dated November 6, 1667, Topping assigned and delivered to Southampton the Topping Deed, and all his right, title, and interest in the lands of the Topping Purchase, *i.e.*, the lands from Canoe Place to Seatuck, including Westwoods. (T197; T13, at 15; Tr. 901-02; 2564-65.) Subsequent to the Nicolls Determination, and on February 22, 1667 (N.S.[20]), several Shinnecock Indians, including Weany Sunk Squaw, Accobacco, and others, confirmed and acknowledged (i) their April 10, 1662 sale of lands to Topping;

---

[19] The Nicolls Determination was made by Governor Nicolls more than 18 months after the date of a letter to Governor Nicolls from Connecticut Colony Secretary John Allyn (the "Allyn Letter"), advising that "by the established order of this [Connecticut] Colony . . . no land was to be purchased to the perticuler use of any person, without the consent of or Generall Courte, and all such purchases to be null in lawe." (D71; T66; Tr. 1200-04, 2194-95.) Thus, at the time of the Nicolls Determination, Governor Nicolls, by virtue of the Allyn Letter, was aware of the existence of a Connecticut General Court order pertaining to the purchase of lands from Indians. (Tr. 2193-95; D25, at 26; D91, at 11-12.) The Allyn Letter does not specify the date or any other identifying feature of the "established order of this

Colony" to which it makes reference, but Professor Hermes testified that the Allyn letter could only have been referring to either the 1650 or 1663 orders of Connecticut Colony. (D71; Tr. 2553.) Professor Hermes also acknowledged that the Allyn Letter was written at a time when Long Island was no longer under the jurisdiction of Connecticut Colony. (D25, at 25-26; Tr. 2552.)

[20] Until 1752, when the Gregorian calendar still used today was adopted, England and its colonies followed the Julian calendar, under which March 25 was the beginning of the new year. (D32, at 28.) In this Memorandum and Order, "N.S." indicates that the date is expressed using the modern, Gregorian calendar (rather than the date expressed in the original document).

(ii) that Topping had sold those lands to Southampton; (iii) that Governor Nicolls had ordered the Town to pay "fourscore fathom of wampum"; and (iv) that they had received such payment from the Town. (S70; S70A; S62, at 12; D91, at 10; Tr. 902-05, 2198-99.) The Shinnecock signatories of the February 22, 1667 (N.S.) document confirmed also that they were "fully contented with the bargaine origeinally made with Capt. Topping." (S70; S70A; S62, at 12; T13, at 16; Tr. 902-03, 905, 2198-99; 2565-56.) The document ended by stating that "wee will defend the s'd Southton men in the possession and enjoyment of the premises from the clayms of any other." (S70; S70a.)

### (2) THE 1667 ACTION COMMENCED BY SOUTHAMPTON AGAINST SOUTHOLD

In 1667, a trial was conducted in the Court of Assizes for the Colony of New York (the "Court of Assizes") in an action commenced by the inhabitants of Southampton against the inhabitants of Southold (the "1667 Action"). (D183, at 59; Stip. No. 64.) The 1667 Action concerned Southampton's contention that it was the owner of lands known as Aquebauke Meadows, and Southampton's claim that Southold had trespassed on such lands. (D183, at 59; Tr. 906, 2574-75.) The Aquebauke Meadows were situated to the west of Westwoods, within the lands of the Topping Purchase. (Stip. Nos. 62, 65; Tr. 2576.) During the trial of the 1667 Action, and in order to prove its claim of ownership of the Aquebauke Meadows, Southampton produced the Topping Deed, and stated that the Topping Deed had been assigned to the Town. (D183, at 60; Tr. 906-07; 2576.) Southampton also introduced the Nicolls Determination, and contended that Governor Nicolls "had put a decision to this matter already, when it was before him upon

Complaint of the Towne against Captain Tapping." (D183, at 61; T12, at 49; Tr. 907-08, 2576-77.)

The jury in the 1667 Action rendered a unanimous verdict in favor of plaintiff Southampton, and Southampton's title to the Aquebauke Meadows was thereby confirmed. (D183, at 62; Tr. 908.) The jury's verdict in the 1667 Action confirmed the validity, legality, and effectiveness of the Topping Deed, and its subsequent assignment to Southampton, as well as the Town's ownership of all lands included within the Topping Purchase, including the Aquebauke Meadows and Westwoods.

### (3) THE 1676 ANDROS PATENT

On July 1, 1674, Major Edmund Andros was appointed governor of the Province of New York by a commission from the Duke of York. (S62, at 25.) On November 1, 1676, New York Colonial Governor Edmund Andros issued a Patent (the "Andros Patent") to the proprietors of Southampton. (T188, at 279-80; T12, at 49-50; S62, at 14; Tr. 2202-03.) Among other things, the Andros Patent confirmed the existence of "a certaine Towne ... commonly called and knowne by the name of South Hampton." (D188, at 279.) The Andros Patent confirmed that the "certaine Tract of Land, thereunto belonging" to Southampton extended from Seatuck on the west to Wainscott (the border between Southampton and East Hampton) on the east, which are basically the east and west boundaries of the Southampton as they are known today. (T188, at 279; T12, at 49-50; S62, at 14; Tr. 908-11.) The western boundary of the tract of land belonging to the Town, as specified by the Andros Patent, is identical to the western boundary of the lands specified in the Topping Deed, i.e., "Seatuck."

18

(T188, at 279; T58, at 167-68; T12, at 50 n.12; Tr. 2204, 2208-10, 2580-81.) Westwoods is located within the boundaries of the "certaine Tract of Land" described in the Andros Patent. (Stip. No. 77; Tr. 2506-07.)

In his Patent, Governor Andros declared that he does "Ratifie Confirme and grant, unto [list of individuals] . . . as Patentees for and on the behalfe of themselves and their Associates the ffreeholders and Inhabitants of the said Towne, their Heires, Successors and Assignes, All the aforementioned Tract of Land . . . and of every part and parcel thereof, to the said Patentees and their Associates, their Heires Successors and Assignes . . . for ever. . . ." (T188, at 279-80.) The Andros Patent also provided that "if it shall so happen that any part or parcell of the Lande within the bounds and Limits afore described be not already Purchased of the Indyans It may bee purchased (as occasion) according to Law. . . ." (T188, at 280.) During the colonial era, New York governors frequently exercised their authority to decide on the validity of purchases from Indians and to impose settlements. (S62, at 27.) There is no historical evidence that the Shinnecock Tribe or any of its members ever challenged or contested, in any way, the validity, legality, or effectiveness of the 1676 Andros Patent. (Tr. 911.) The Colony of Connecticut had no jurisdiction over the Province of New York at the time the Andros Patent was issued. (Tr. 1205.)

Accordingly, the 1676 Andros Patent, especially when considered in the context of the prior transactions and documents involving Westwoods, confirmed Southampton's ownership of all lands west of Canoe Place, including Westwoods.

### (4) THE 1686 DONGAN PATENT

In January of 1683, Colonel Thomas Dongan received from the Duke of York instructions and a commission constituting him the Governor of the Province of New York. (S62, at 28.) In 1686, Governor Dongan received a new commission and instructions directly from the King of England, which granted him certain powers and authority. (S72, at xvii, 177-78; S62, at 28-29; S74.) Governor Dongan was granted full power and authority "to make, constitute and ordain Laws, Statutes and Ordinances for the publick peace, welfare & good Government of our said Province and of the people and inhabitants thereof." (S72, at xvii; S62, at 28-29; S74.)

On December 6, 1686, Governor Dongan issued a Patent (the "Dongan Patent") to the proprietors of Southampton. (T69; S62, at 15-18; T12, at 50-51.) The term "ffreeholders," as used in the Dongan Patent, described individuals who were the proprietors of Southampton. (Tr. 2294.) There is nothing in the Dongan Patent (relating to Southampton's title) that is inconsistent with the scope of Governor Dongan's authority, as set forth in his 1686 commission and instructions from the king. (S62, at 29.) The Dongan Patent, *inter alia*, confirmed and reiterated the provisions of the Andros Patent, including its description of the "certaine tract of Land" belonging to Southampton, running from Wainscott on the east to Seatuck on the west. (T69, at 385; T188; Tr. 911-12, 2213-14, 2588-89; T12, at 50-51.)

The Dongan Patent recited that it was issued in response to an application submitted by Major John Howell, a freeholder of Southampton, and one of the patentees under the Andros Patent, to "confirm unto ye

19

ffreeholders of said Towne in a more full & ample manner all the aboverecited tracts and parcells of land within the limits and bounds aforesaid and finally determine the difference between the [I]ndyans and the ffreeholders of the said towne of Southampton." (T69, at 387; Stip. No. 72.) The Dongan Patent recited that Governor Dongan had "examined the matter in variance between the ffreeholders of the said Towne of Southampton and the [I]ndyans and do finde that the ffreeholders of the Towne of Southampton aforesaid have lawfully purchased the lands within the Limitts and bounds aforesaid of the [I]ndyans and have payd them therefore according to agreement so that all the [I]ndyan right by virtue of said purchase is invested into the ffreeholders of the Towne of Southampton aforesaid . . . ." (T69, at 387-88; T12, at 50; S62, at 15-16; Tr. 911-13, 2218-19.) The "lands within the Limitts and bounds aforesaid" referenced in the Dongan Patent are stated explicitly to be the lands of Southampton, from Wainscott on the east to Seatuck on the west.[21] (T69, at 385, 387; S62, at 17; Tr. 2217.)

As was the common practice at the time, the Dongan Patent was recorded in the Secretary's Office for the Province of New York and perused by the Attorney General, who found "Nothing Contained therein prejudiciall to his Majys Jnterest." (S62, at 29; S65 at 394.) The Dongan Patent created

and established a body "Corporate and Politique," known as the "Trustees of the ffreeholders and commonalty of the Towne of southampton" (the "Southampton Trustees"), which was made up of the freeholders and inhabitants of Southampton. (T69, at 388.) There is no historical evidence that the Shinnecock Tribe or any of its members ever challenged or contested, in any way, the validity, legality, or effectiveness of the Dongan Patent. (Tr. 913.)

Accordingly, the 1686 Dongan Patent confirmed Southampton's ownership in all lands west of Canoe Place, including Westwoods.

### (5) THE 1676 ORDER OF THE COURT OF ASSIZES

On October 5, 1676, the Court of Assizes noted that the Town of Southold ("Southold") and Southampton had not yet complied with the Law of 1664 and prior orders concerning the taking out of "Grants, Patents or Confirmations for their Towns or Lande." (D77, at 723-24.) By Judgment of the Court of Assizes, dated October 5, 1676, the Court held that Southold and Southampton "have forfeited all their titles, Rights & priviledges to the lands in the sd Townshipps & if they doe not by Monday fortnight next (being the 23rd day of this instant month) send up the acknowledgmt of their past Default & Resolves & Desire to obey & fulfill the Law & the severall orders of the Cort of Assizes, for the taking out their Grants, Patents or Confirmations, as directed by Law, Then Execution to issue out by Authority of this Crt for the above forfeiture to the use of his Maty without further delay" (the "1676 Judgment") (D77, at 724.) The Town complied with the 1676 Judgment, as well as the Law of 1664 and prior orders of the Court of Assizes

---

[21] Although Professor Hermes stated that because the Dongan Patent was issued 12 days after the confirmation of the 1640 Indian deed it can reasonably be inferred that the dispute involved lands east of Canoe Place, (Tr. 2590), the Court rejects that speculative conclusion and, instead, relies upon the above-referenced description of the land contained in the Dongan Patent that contradicts Professor Hermes's conclusion.

20

referenced therein, by October 23, 1676, the deadline set by the 1676 Judgment. (D77, at 724.)

There is absolutely no evidence that the execution of the above-referenced Judgment of forfeiture, and the actual forfeiture of Southampton's titles, ever occurred. According to James Truslow Adams's *History of the Town of Southampton*, in 1670, the Southampton titles, including those acquired from the Indians, "were declared invalid by the Court of Assize[] unless renewed under the new government." (D42, at 89.) The foregoing passage confirms that the invalidation of Southampton's titles was conditional only. In other words, it would occur only if the 1676 Judgment were executed, if the Town did not comply with the Judgment by October 23, 1676. (D42, at 89.) The condition expressed in the 1676 Judgment did not occur and, therefore, the forfeiture of Southampton's land titles never occurred.

## G. USE AND OCCUPANCY OF LAND WEST OF CANOE PLACE, INCLUDING WESTWOODS

The Court has carefully examined the evidence to determine what, if any, use and occupancy of land west of Canoe Place, including Westwoods, has occurred by the Nation since these colonial era transactions and events. As set forth in detail below, based upon that review of the evidence, the Court concludes that, with respect to the period from the late 17th century through the 18th century, there is overwhelming evidence that the Nation occupied land to the east of Canoe Place during this period and scant, if any, evidence that they occupied and used land west of Canoe Place, which is where Westwoods is located. Moreover, even if members of the Shinnecock Tribe inhabited areas west of Canoe Place at some time

between the 17th and at least the end of the first three quarters of the 19th century – as asserted by defendants' habitation witness Dr. Jack Campisi – there is no evidence that their use or occupancy was exclusive or continuous, and there is no evidence of how many Shinnecock resided there, or where, or for how long. For example, as conceded by Dr. Campisi, there are no records for the period 1743 through 1889 that indicate that the Shinnecock Indians lived west of Canoe Place, but there are records during that period that indicate that the Shinnecock Indians lived east of Canoe Place. (Tr. 2754-57.) Moreover, Dr. Campisi's conclusions are of limited value because he completely disregarded and failed to explain the numerous above-referenced colonial era documents – such as the Ogden Deed, the Topping Deed, and the Nicolls Determination – that support the conclusion that the Shinnecocks sold all their lands west of Canoe Place and resided east of Canoe Place. In short, the Court finds that there is no evidence of regular or continuous Shinnecock Indian Nation habitation on Westwoods from 1640 to the early 20th century. Instead, the use and occupancy evidence is consistent with the conclusion that the Shinnecock Tribe sold its rights, title, and interest in the lands west of Canoe Place in the 17th century and resided east of Canoe Place. The Court has analyzed the evidence offered by both parties on this issue and provides below the reasons for the Court's conclusions.[22]

_____

[22] Although the Court has fully considered all the evidence offered during the trial and has even addressed certain evidence that it viewed as immaterial, not every single piece of evidence on this issue (or on the other issues) is referenced in this Memorandum and Order. To the extent certain evidence is not referenced, the Court did not deem such evidence to be probative and did

## (1) The 1703 Lease Lands

By an "Indenture" dated August 16, 1703 (sometimes referred to as the "1000 year lease"), the Shinnecock Indians acquired from the Town certain usufruct rights, for a period of 1,000 years, in lands east of Canoe Place. (T73; Tr. 2755; T12, at 55-57.) The lands that are the subject of the Indenture (collectively, the "1703 Lease Lands") include the Shinnecock Hills, the areas known as Sebonack and Cold Spring, and Shinnecock (Great) Neck. (T199; T12, at 55-56, 63, 65, 76, 87; T73; Tr. 2755.) In conjunction with the execution of the 1703 Indenture, the Shinnecocks executed a confirmatory deed to the Trustees of Southampton, dated August 16, 1703, in which the Tribe confirmed that it did "give grant Remise Release and for ever Quit Claim unto ye said Trustees . . . all such Right, Estate, title, Interest and Demand whatsoever, as they . . . and their people had or out [ought] to have of in or to all that tracte of Land of ye township of Southampton. . . ." (T72, at 176; T12, at 52-55; T229, at 9, 17.)

As of the latter part of the 18th century (circa 1790), the Shinnecock Tribe was situated only east of Canoe Place, near Cold Spring, and not west of Canoe Place. (T12, at 10, 76, 87; T73; T121, at 541; T199; T203; Tr. 913-21, 1220-21.) In the late 18th century, the Shinnecocks constructed, or caused to be constructed, a meeting house that was situated to the east of Canoe Place. The meeting house was completed sometime after September 27, 1791. (T123, at 514; T199; T13, at 18-19; Tr. 919-21.)

_____

not believe it warranted particular discussion.

## (2) Canoe Place Chapel

The so-called Canoe Place Chapel or Warnertown Chapel was located to the south of Westwoods, and south of Montauk Highway. (Tr. 1222-23.) The Canoe Place or Warnertown Chapel was not exclusively a Shinnecock house of worship. (Tr. 1223-24.) The chapel, which was at one time located next to the burial plot of the Reverend Paul Cuffee, is located to the south of Westwoods. (Stip. No. 41; Tr. 1226-29.) There is no historical evidence that there was a Shinnecock tribal settlement in the location of the Paul Cuffee burial plot, which is located to the south of Westwoods. (Tr. 1236-38.) If members of the Shinnecock Tribe ever lived in the area of Westwoods in the 17th century, that habitation ended no later than 1675. (Tr. 2658-60, 2727.) There is no evidence of Shinnecock tribal habitation on Westwoods itself.

## (3) Missionary Records

Missionary records do not show that members of the Shinnecock Indian Tribe or Nation inhabited Westwoods during the 18th century. (Tr. 2730-31.) There are no references in missionary Azariah Horton's journals, from the 18th century, to Canoe Place or to the property now known as Westwoods. (Tr. 2731-32; D110.) The list of places Horton visited, according to his journals, do not show a pattern of Shinnecock residence at Canoe Place or Westwoods. (Tr. 2733-34; D110.) The principal quarters of Long Island Indian tribes were at cornfields, and for the Shinnecocks, the cornfields were at Sebonack or Shinnecock Neck, east of Canoe Place. (Tr. 2734-35.) There were no cornfields at Canoe Place or Westwoods. (Tr. 2735.) Accounts of the Indian missionary Samson Occum provide no evidence of Shinnecock

habitation west of Canoe Place. (Tr. 2736-38.) Accounts of the Indian missionary Peter John do not identify the Shinnecock Indians with the church at Canoe Place and provide no evidence of Shinnecock habitation west of Canoe Place or at Westwoods. (Tr. 2738-39.) The church that the Indian missionary Paul Cuffee was instrumental in building was located east of Canoe Place. (Tr. 2740.) The 1809 Annual Report of the Board of Directors of the New York Missionary Society (the "1809 Annual Report") refers to a June 9, 1808 communication from Paul Cuffee, reflecting that he ministered to "four different societies," identified as the "Montauk," "Cold-Spring," "Puspatock," and "Islip." (T205, at 8-9.) The 1809 Annual Report also reflects a communication of Paul Cuffee, dated April 17, 1809, which reported that "[t]he tribe of Chinecock, or Cold-Spring consists, including children, of 109 persons or there-about." (T205, at 17.) Paul Cuffee's communications referring to the society at "Cold-Spring," and to "[t]he tribe of Chinecock or Cold-Spring" suggest that, as of 1808 and 1809, the Shinnecock Tribe was situated to the east of Canoe Place, at Cold Spring.

In the summer of 1902, anthropologist/archaeologist M.R. Harrington undertook extensive archaeological excavations of numerous Shinnecock Indian sites in Southampton. (T13, at 19; T200, at 231.) In his 1924 paper entitled *An Ancient Village Site of the Shinnecock Indians*, prepared for the American Museum of Natural History, Harrington wrote about his 1902 excavations at an ancient village site situated east of Canoe Place, on the west bank of Sebonac Creek. (T200, at 233.) In his paper, Harrington identified this ancient village site as a Shinnecock village, dating back at least "three hundred years ago" (circa 1602), and

noted that "we have good reason for assuming that the village was Shinnecock from first to last." (T200, at 233, 246; T13, at 19-20.) This ancient village was situated in the Sebonack/Cold Spring area, east of Canoe Place. (T13, at 19-20; T200, at 233.) The Shinnecock habitation at Sebonack, in the mid-17th century, is confirmed by a 1649 agreement between the Town and the Shinnecocks, who are referenced therein as the "Soaponack Indyans." (T203; T13, at 20-21.)

Defendants' expert Dr. Campisi testified that Indians who attended a church west of Canoe Place may have walked as much as twelve miles to attend church, whether they lived east or west of Canoe Place. (Tr. 2742.) With respect to accounts of Indian missionary William Benjamin, Dr. Campisi admitted that his opinion that 70 members of the Shinnecock Tribe were members of the church in Canoe Place in 1845 may not be correct and, therefore, may not support his conclusion of Shinnecock habitation west of Canoe Place in the 19th century. (Tr. 2743-44, 2746-49.) With respect to Indian missionary James Downs, Dr. Campisi does not know whether his congregation at the church in Canoe Place consisted of Shinnecock Indians or whether it included other Indians and non-Indians. (Tr. 2751.) Downs's history of Canoe Place indicates that around 1830, there were non-Indians living in the vicinity of the churches west of Canoe Place. (Tr. 2751-53; D376.) Downs's *History of the Shinnecocks* indicates that, in 1827, William Benjamin's church at Canoe Place included both Poosepatuck and Shinnecock Indians. (D108, at 13.) Downs, in describing the missionary and preaching activities of Azariah Horton on eastern Long Island between approximately 1742 and 1752 stated, "[h]e [Horton] appears to have ben [sic] untiring in his efforts for the

salvation of perishing souls while the principal settlements of the Indians were at Montauk and Shinnecock and therefore most of his time was spent there. . . ." (D108, at 8.) The reference to "Shinnecock" in this passage, given the entire historical record, is a reference to lands east of Canoe Place, within the 1703 Lease Lands. (T73; T199; T226.) Thus, Downs concluded that the principal settlements of the Indians between 1742 and 1752 were located at Montauk and Shinnecock, not any location west of Canoe Place.

Edward Ernest Eells's article entitled *Indian Missions on Long Island*, at Part IV, "Azariah Horton," cites Horton's journal for the following proposition: "Although, as Horton states, Montauk was the home of the largest group of Indians on Long Island, yet there was a large group in Southampton at Sebonac. . . . These were the Shinnecock Indians. . . ." (D112, at 171 (footnotes omitted).) By 1845 (the date of publication of Prime's *History of Long Island,* (T248)), Shinnecock Neck was "the residence of the remnants of the Shinnecock tribe of Indians. Their church formerly stood beyond the hills, about 3 miles west, within sight of the isthmus called Canoe Place. It was afterwards removed a little to the west, at the spot where the grave of the Rev. Paul Cuffee is still to be seen. . . . The Indians having taken up their residence some years ago on this Neck, removed their church thither, where the Rev. *William Benjamin* supplies them half the time." (T248, at 216-17) (italics in original.) The Presbyterian church at Canoe Place was "extinct" by 1845, but a small Congregational church, consisting of only 12 members, still existed in that vicinity. (T248, at 217.)

### (4) LEASE OF TIMBER LANDS WEST OF CANOE PLACE BY THE NATION

By the early part of the 19th century, timber resources within the Town were being rapidly depleted. (T12, at 62-68; T13, at 32-35; Tr. 932-37; T94; T95; T176; T239, at 223.) As the Shinnecocks' timber resources to the east of Canoe Place became depleted, the Shinnecocks sought to obtain from Southampton the right to cut timber situated to the west of Canoe Place. (T12, at 97-98; T13, at 32-35; Tr. 932-37.) At an Indian Trustee Meeting held on April 7, 1808 (the "1808 Trustee Meeting"), it was voted, in the presence of Shinnecock Trustees and the Southampton Trustees, that the Shinnecocks lease 120 acres of land west of Canoe Place. (T134; T12, at 95-97; Tr. 934-37.) The land referred to in the minutes of the 1808 Trustee Meeting was bounded on the west by "Conklin's Corner." (T134; T12, at 96.) Conklin's Corner was a corner formed by lands of Israel Conklin (who owned lands west of Canoe Place, but no lands east of Canoe Place), and it was located in the vicinity of Westwoods, to the west of Westwoods. (T102; T114; T115; T116; T12, at 79-82, 95-96; Tr. 937-39.) The 120 acres referred to in the minutes of the 1808 Trustee Meeting included Westwoods. (T12, at 95-97; Tr. 934-38, 945.) The 120 acres described in the minutes of the 1808 Trustee meeting were to extend from Conklin's Corner "East to the Old Field." (T134; Tr. 938.) According to James P. Lynch, plaintiffs' ethnohistorical expert, the "Old Field" was also known as "Roger's Meadow," was bounded on the east by Canoe Place Pond, and extended westward into the Canoe Place

Division.[23] (Tr. 938.)

## (5) THE 1822 PETITION TO THE NEW YORK STATE LEGISLATURE

In an 1822 petition of the Shinnecocks to the New York State Legislature, the Shinnecocks claim to be the "lawfull owners of a certain tract of land lying in the said

Town of Southampton . . . bounded on the west by a place called canoe place. . . ." (T136; T12, at 99; Tr. 923-25.) Thus, this petition referenced land claims by the Shinnecocks only to the east of Canoe Place, and no claims of ownership were made by the Shinnecocks in this petition for any land west of Canoe Place. (T136; T12, at 99; Tr. 923-925.)

## (6) INDIAN HUTS PHOTOGRAPH

Defendants offered a photograph of purported Indian huts in 1879. (D377.) However, based upon the description accompanying the photograph, the huts were not located at or near Westwoods, and the photograph does not show the presence of a Shinnecock settlement at Canoe Place. It is also not known whether these huts were occupied by Indians or non-Indians at the time. (T247, at 280, 282; Tr. 2775-78.)

## (7) THE 1890 *CASSADY* LITIGATION

The tract of land referred to in the action entitled *Trustees of the Tribe of Shinnecock Indians v. James Cassady*, Supreme Court of the State of New York, Suffolk County, filed July 21, 1890 (the "*Cassady* Litigation"), includes Westwoods, in whole or in part. (Stip. No. 100; Tr. 961.) The record of the *Cassady* Litigation includes no reference to any Shinnecock claim of subsisting aboriginal rights; instead, the Findings of the Court reference defendant's contention that the Shinnecocks had purchased Westwoods. (D2; Tr. 962.) One of the Findings of the Court in the *Cassady* Litigation was that the Shinnecock Tribe had been in "quiet and peaceable possession of the premises where the alleged trespass occurred, for upward of sixty years." (D2, at "First" Finding.) The Findings of the Court in the *Cassady*

---

[23] There are also references to the leasing of land west of Canoe Place in the vicinity of Westwoods in documents relating to the widening of Newtown Road in the 1920s. In particular, on or about November 1920, civil engineer J.A.S. Gregg, in response to the "orders" of the Southampton Town Superintendent, surveyed and laid out part of Newtown Road, in the vicinity of Westwoods. (T207; T208; T232, at 350; T13, at 29; Tr. 976-79.) On or about October 12, 1921, Gregg prepared a statement of land available and land required for the widening and improvement of Newtown Road in the vicinity of Westwoods. (T208; Tr. 977-81.) Gregg's statement references, under the heading "Land already available for road," 2021.7 lineal feet of the "Old road from Mr. Jaques' entrance to land leased to Indians" and 2362.3 lineal feet of the "Old road through land leased to Indians." (T208.) Gregg's statement also references, under the heading "Land Required," 78,849 sf. of "land leased to Indians." (T208.) Gregg's references to "land leased to Indians" support the conclusion that the current Shinnecock presence at Westwoods was the result of the Shinnecocks having obtained a lease from the Southampton Trustees circa 1808. (T13, at 30-31; Tr. 979-81.) In fact, defendants' title examination and abstracting witness, Mason Haas, testified that he is not aware of any lands, other than Westwoods, referred to in any respect as "Indian land" as of 1921, the year in which Town Exhibit 208 was created. (Tr. 3064-65.) The Town's widening and improvement of the portion of Newtown Road that runs across Westwoods, in the early 1920s, occurred without any objection or protest by the Shinnecock Tribe. (T13, at 29-31; Tr. 976-81.)

Litigation did not include any finding or determination that (i) the Shinnecocks had aboriginal rights in the subject premises; (ii) the Shinnecocks had been in possession of the premises since time immemorial; or (iii) the Shinnecocks had been in exclusive possession of the premises since any time prior to circa 1830. (T12, at 116-17; D2.) The record of the *Cassady* Litigation contains no evidence that the Town was aware, at any time, of the purported sale of the subject premises by Shinnecock Trustees to Miles Carpenter. (D2, at "Second" Finding; Tr. 1245-46.) Defendants' witness, Dr. Campisi, testified that the land that was the subject of the *Cassady* Litigation was not where the Shinnecock Indians lived. (Tr. 2781.)

### (8) THE 1922 *HUBBARD* LITIGATION

The tract of land referred to in Paragraph "V" of the Findings in the action entitled *Shinnecock Tribe of Indians v. Hubbard*, Supreme Court of the State of New York, Suffolk County, judgment entered December 27, 1922) (the "*Hubbard* Litigation"), includes Westwoods, in whole or in part. (Stip. No. 101; Tr. 963.) The Findings in the *Hubbard* Litigation include a finding that "for more than 70 years last past" plaintiff Shinnecock Tribe and its members "have obtained its firewood and fencing" from Westwoods, but the record in the *Hubbard* Litigation does not include a finding or determination that (i) the Shinnecocks claimed or had aboriginal rights in the subject premises; (ii) the Shinnecocks had been in possession of the premises since time immemorial, or (iii) the Shinnecocks had been in possession of the premises since any time prior to circa 1850. (D1, at Findings ¶ "V"; Tr. 963; T12, at 121-25.) The Opinion of Referee William Pelletreau in the *Hubbard* Litigation states that the plaintiff tribe "has

only such rights to litigate as are conferred by statute." (D1, at Opinion.)

Despite the statement that "within the memory of living witnesses three, four or five families of said tribe resided on said tract," which appears in the "Findings" of the referee appointed in the *Hubbard* litigation, there is no basis on which to conclude that (i) those families resided on the approximately 80-acre Westwoods parcel, inasmuch as the tract at issue in the *Hubbard* Litigation was stated to be "about 100 acres" in size; (ii) any of those families were living in Shinnecock tribal relations; or (iii) any other families or individuals ever resided at Westwoods. (D1, at ¶¶ "V" and "VI" of "Findings;" Tr. 2781-82.) The Findings in the *Hubbard* Litigation also state that "plaintiff [Tribe] has for many years resided on Shinnecock Neck in the town of Southampton."[24] (D1, at ¶ "IV" of "Findings.")

### (9) MAPS

As set forth below, maps of the Town from 1797 to the early 20th century do not support a conclusion of Shinnecock habitation west of Canoe Place or at Westwoods.

A 1797 survey map created by the New York State Department of Transportation (the "1797 DOT Map") depicts the Indian meeting house, discussed *supra*, to the east of Canoe

---

[24] The testimony of defendant Mr. Gumbs, discussed *infra*, that no portion of Westwoods has ever been allotted to any tribe member, undermines the contention of the defendants, as well as the referee's finding in the Hubbard Litigation, that "within the memory of living witnesses three, four or five families of said tribe resided on said tract." (D1, at ¶ "VI" of "Findings.)

Place, and identifies Indian habitation only to the east of Canoe Place; the 1797 DOT Map indicates no Shinnecock habitation to the west of Canoe Place. (T199; Tr. 920-21, 2760-61; T13, at 18-19.) As depicted on the 1797 DOT Map, the Indian meeting house was situated within the 1703 Lease Lands, which are depicted on the 1797 DOT Map as "Shinnecock tribe & Indian Reserve." (T199; T13, at 18; Tr. 920-21.) According to Mr. Lynch, the Indian meeting house depicted on the 1797 DOT Map was "a marker denoting the main location of Shinnecock settlement from circa 1602 through 1809 and beyond." (T13, at 18-19.)

A 1780 map prepared by Major John Andre does not show any habitation at all in the vicinity of Westwoods, and no Indian habitation at all west of Canoe Place. (D208a; Tr. 1049-50.)

An 1829 map of Suffolk County created by David Burr (the "1829 Burr Map") does not indicate the presence of Shinnecock Indians to the west of Canoe Place, but does indicate the name Shinnecock (spelled "Shunnecock") east of Canoe Place. (T360; Tr. 1232-34, 2762-63, 2765-66.) The 1829 Burr Map depicts the presence of an Indian meeting house to the east of Canoe Place -- the same Indian meeting house that is depicted on the 1797 DOT Map. (T360; T199; Tr. 1233.)

The 1833 Sumner Map shows a triangle symbol, which indicates the location of Indians, east of Canoe Place. (T250; Tr. 2766-68, 2685.)

The 1836 J. Calvin Smith Map (the "1836 Smith Map") erroneously locates a Shinnecock reservation south of Canoe Place, on the west side of Shinnecock Bay,

according to a report co-authored by Dr. Campisi. (D119; T251, at 37; Tr. 2769-71.) An 1839 republication of the 1829 Burr map repeats the error of the 1836 Smith Map. (D118; Tr. 2771-72.)

The 1838 U.S. Coast Guard and Geodetic Survey Map shows no Indian dwellings or Indian habitation west of Canoe Place but does show Indian dwellings east of Canoe Place at Shinnecock Neck. (T247, at 265, 269-71; Tr. 2772-75.)

The 1859 Chace Map places the Shinnecock Indians east of Shinnecock Bay, and east of Canoe Place, on Shinnecock Point or Shinnecock Neck, and contains no indication of Shinnecock presence west of Canoe Place. (T247, at 272; Tr. 2775; D29, at 12.)

The Gazetter of the State of New York (Tenth Edition), published in 1861, reported that in Southampton, an Indian settlement, which was "the residence of the remnant of the Shinnecock Indians, consisting of about 200 persons," was situated on the east side of Shinnecock Bay. (T144, at 638 n.12.)

The 1873 Beers Map places the Shinnecock Indians east of Shinnecock Bay, and east of Canoe Place, on Shinnecock Point or Shinnecock Neck, and contains no indication of Shinnecock presence or habitation west of Canoe Place. (T247, at 274; Tr. 2775; D29, at 12.)

The Map Showing the Subdivision of the Town of Southampton Among the Proprietors (the "Proprietor's Map"), created by or under the direction of William S. Pelletreau, not later than 1885, references two locations east of Canoe Place as lands in which the Shinnecocks held an interest, namely

Shinnecock Hills and Shinnecock Neck, but does not indicate any other lands in which the Shinnecocks held an interest, including but not limited to, any lands west of Canoe Place, including Westwoods. (T226.)

The 1902 Art Village Map shows the Shinnecock settlement at Shinnecock Neck, east of Canoe Place, and shows no Shinnecock presence west of Canoe Place. (T247, at 272, 275; Tr. 2779-80.)

The 1916 Belcher Hyde Map shows the Shinnecock tribal village or residences on the Shinnecock Reservation and contains no indication of Shinnecock habitation or settlement west of Canoe Place. (T247, at 272, 276-77; Tr. 2780.)

The 1929 Dolph Stewart Map includes the words "Shinnecock Indians" in the general vicinity of Westwoods but shows the Shinnecock Reservation east of Canoe Place. (T247, at 275, 278-79; Tr. 2780-81.)

In sum, the maps of the Town during this period do not support a conclusion of Shinnecock habitation west of Canoe Place or at Westwoods.[25] (Tr. 2757-81.)

(10) OTHER RECORDS AND WRITINGS

The Court also has examined other records and writings, referenced by defendants, to determine if they support Shinnecock habitation west of Canoe Place at Westwoods on a continuous basis since the 17th century. None of this other evidence supports such a conclusion. For example, the writings of Timothy Dwight provide no information that indicates a Shinnecock presence or habitation west of Canoe Place in the early 19th century. (Tr. 2782.)

Similarly, Russell Carman's article *In the Beginning: The Shinnecock Indians and the First White Settlers in Quogue*, (D107), is also not reliable or persuasive. Carman reports that "[t]he Indians told my grandfather, and he told me, that a large portion of the [Shinnecock] tribe lived, except during the severe cold months, on the bluffs overlooking Peconic Bay, on the westerly side of the 'haulover', where the Shinnecock locks are today." (D107, at 1.) However, the article does not identify the historic period during which this information was reported. Moreover, Carman cites no historic sources or historic documents for the information contained in his article concerning Shinnecocks living west of the "haulover" and no historic sources corroborate Carman's account.[26] (Tr. 2724-25.)

---

[25] A February 2003 Stage I Archaeological Survey for the "Shinnecock Reservation – West Hills" concluded, on the basis of archival research and 249 test excavations within a 15-acre area claimed by the Shinnecock, that "the project area witnessed minimal documented human activity in the past." (T135, at ii; T12, at 98-99; Tr. 964-66.) The 15-acre parcel studied in the February 2003 Survey was within Westwoods. (T135 at 16, 17, 21; Tr. 965.)

[26] Dr. Campisi testified that it was his opinion that one of the two possible periods to which the events described in the paragraph of Carman's article recounting Indians living west of the "haulover" could be referring was sometime between 1620 and 1637. (D107, at 1; Tr. 2658-59.) Dr. Campisi also testified that it was his interpretation that the Indians told Russell Carman's grandfather the information about where Shinnecocks lived in approximately 1876. (D107,

To support their position, defendants also rely on a report written by Barbara M. Moeller, who was engaged by the Town to produce a historical profile of Hampton Bays, as well as Ms. Moeller's deposition. The 2005 report made several conclusions, including the following: (1) the Canoe Place Inn (which is about 700 yards south of the closest Westwoods boundary) "has been an Indian habitation location for centuries" (D192, at 13); (2) there was an Indian burying ground at the site of the grave of Paul Cuffee (which is about one-half mile southwest of the closest Westwoods boundary) and that Indian remains other than those of Cuffee are or were buried at the site (D192, at 16); and (3) early settlers in Hampton Bays mingled with

Indians already living in the area (D192, at 54). Ms. Moeller also opined that when the railroad went through the grave of Paul Cuffee in 1869, Indian remains there were dug up and moved to the Shinnecock Reservation. (D359, at 78-80.) The Court finds Ms. Moeller's report and opinions to have little probative value. As an initial matter, it is clear from the circumstances surrounding the commissioning of the work, as well as from a review of the report itself, that it was not intended to be a scholarly work, but rather was meant to provide general historical information as a planning tool related to future development and decisions regarding preservation of structures or sites. (D359, at 28, 69.) Moreover, Ms. Moeller's qualifications in historic research are very limited; in fact, Ms. Moeller conceded that to say that she specializes in historic research is "an overstatement of my talents." (D359, at 37-38.) More importantly, Ms. Moeller does not provide an explanation as to how she arrived at her opinions, and defendants have not offered any evidence to otherwise support these conclusions. Thus, in light of the entire trial record, the Court declines to credit these unsubstantiated conclusions.[27] Moreover,

---

at 1; Tr. 2656-58.) Thus, according to his interpretation of the time-frames at issue in the Carman article, Carman's grandfather was told by the Indians the information concerning the purported habitation of Indians west of the haulover 200 years after the latest time at which those habitations had occurred. (D107, at 1; Tr. 2726-27.) Dr. Campisi also admitted that he does not know whether the "bluffs," referred to in the Carman article as having been a location where Indians purportedly lived, included Westwoods. (Tr. 2725.) Dr. Campisi conceded that the Carman article is not a learned treatise, is not a primary historical document, and is not a primary source article on which he would rely solely. (Tr. 2654-55, 2726.) Thus, Dr. Campisi acknowledged that Carman's hearsay article "is not the strongest piece of evidence in the world" concerning purported Shinnecock habitation. (Tr. 2658-60.) Dr. Campisi also admitted that: (1) historic sources indicate that the locations regularly occupied by the Shinnecocks in the 17th and 18th centuries were at Shinnecock Neck, Quogue, and Sebonack, sometimes called Cold Spring (Tr. 2725-26); and (2) historic sources do not include the property now known as Westwoods as the location regularly occupied by the Shinnecocks in the 17th and 18th centuries (Tr. 2726).

[27] For similar reasons, to the extent that defendants also seek to support their position or to undermine or discredit Mr. Lynch's analysis by pointing to the draft article by Town Historian Henry Moeller entitled *Three Indian Meetinghouses*, as well as discussions by Mr. Lynch about that draft article, the Court does not find that Mr. Lynch's concern with the article undermines his credibility or conclusions. In fact, Henry Moeller acknowledged that the draft article was not published because he is not convinced that he knows what happened as it relates to these historical events. (D363, at 337.) In short, the article has virtually no probative value and does not impact the conclusions drawn by the Court based on the entire trial record.

even if Ms. Moeller's conclusions are true, the presence of Indians in the vicinity of Westwoods falls far short of establishing continuous use and occupation of Westwoods by the Shinnecock Nation.[28]

---

[28] Defendants also suggest that "[n]umerous documents relating to Indian records and archeology, possibly containing information relevant to the Shinnecock Indian Nation's possession of Westwoods, known to have been in the custody of the Town have disappeared." (Defs. Proposed Findings of Fact, at ¶ 171.) The primary basis for this contention is a statement by Mr. Moeller that "sensitive" archeological information given to the Town of Southampton Planning Department in the 1970s could not be found when he looked for such information more recently. (D199, at 1; D363, at 220-22.) However, there is no evidence as to the content or subject matter of this information, and there is no reason to believe that it had any relevance to the issues that are the subject of this litigation. Moreover, Mr. Moeller also agreed that the archeological information that he was unable to find may have been kept in "a different form" by the Town within the Town records. (D363, at 224-25.) Thus, the Court does not find any basis to conclude that documents relevant to this litigation are missing or that, even if they were missing, they would be favorable to the Nation's position. As discussed in detail *supra*, there is an overwhelming historical record from which the Court makes its conclusions in this case on the issue of extinguishment of aboriginal title.

## H. STATEMENTS BY NATION REPRESENTATIVES REGARDING WESTWOODS

### (1) 1888 NEW YORK STATE LEGISLATIVE HEARING

In 1888, the New York State Legislative Assembly appointed a "Special Committee to Investigate the Indian Problem of the State of New York" (the "Special Committee"). (T133.) Milton Winfield Lee, a Shinnecock Tribe member who was later elected multiple times as a Shinnecock Tribal Trustee, provided sworn testimony before the Special Committee. (T145, at 850-51; T229, at Appendix 14; T12, at 95, 98, 107, 112-13.) Lee testified to the following: (1) "The tribe bought fifty acres of wood land"; (2) "I think they [the tribe] have a deed of this tract"; and (3) "We bought it of Wakeman Foster . . . a white man. . . ." (T145, at 851; T12, at 95, 98, 107, 112-13; Tr. 958-60.) The "wood land" referred to by Lee included a portion of Westwoods. (T12, at 94-95; Tr. 959.) According to Mr. Lynch, Foster held no rights in lands in the vicinity of Westwoods, and thus Foster could not have been the source of any rights claimed by the Shinnecocks in Westwoods. (T12, at 107, 113-14; Tr. 960.) According to Mr. Lynch, the loss of the Shinnecock's native language, which occurred as a result of "profound socio-cultural change," caused Shinnecock memories, based on oral tradition, to become distorted.[29] (T12,

---

[29] On August 10, 1888, James H. Foster, a Southampton native familiar with the Shinnecocks, also provided sworn testimony before the Special Committee, at Southampton. (T133 at 827-838.) Mr. Foster was a Justice of the Peace of Southampton. (T133 at 831; T169 at 296.) Mr. Foster testified to a Shinnecock claim that the Tribe had purchased "about fifty acres" of

at 107, 109; T144.)

## (2) THE 1943 JOINT LEGISLATIVE COMMITTEE

On October 14, 1943, Fred Smith, who identified himself as a member of the Shinnecock Tribe, gave sworn testimony at a public hearing of the "Joint Legislative Committee on Indian Affairs," which had been established by the New York State Legislature. (T233, at 39; Stip. No. 94.) Smith was 74 years of age when he testified on October 14, 1943, and he had always lived in Southampton. (T233, at 39.) Mr. Smith was referring to the Westwoods Parcel or to a parcel of land including Westwoods when he referred to the "west wood land" in his testimony. (Stip. No. 95.) Mr. Smith testified that the Tribe had purchased Westwoods "by some money the Shinnicocks [sic] had." (T233, at 42.)

## (3) THE 1978 SHINNECOCK NATION LITIGATION REQUEST

In February 1978, the Shinnecock Indian Tribe submitted to the United States Department of the Interior a "Litigation Request and Statement in Compliance with 25 CFR § 54.6 by The Shinnecock Tribe" (the "1978 Litigation Request"). (Stip. No. 89; T229.) The land that was the subject of the

woodland, "seventy or eighty years ago," *i.e.*, 1808-1818. (T133 at 830; T12 at 111-12; Tr. 945-946, 954-958.) The "woodland" referred by Mr. Foster in his testimony before the Special Committee was Westwoods. (T12 at 94-95; Tr. 958; T133 at 830.) During Mr. Foster's testimony before the Special Committee, there was no mention that the Shinnecock had subsisting aboriginal rights to Westwoods. (T133; T12 at 115.)

1978 Litigation Request did not include Westwoods or any other land located to the west of Canoe Place. (Stip. No. 90.) In support of the 1978 Litigation Request, the Shinnecocks submitted to the Department of the Interior a "Memorandum in Support of Litigation Request" (the "1978 Memo") and various "Appendices" and documentary exhibits. (Stip. No. 91; T229.) One of the three signatories of the 1978 Memo was Marguerite Smith, an attorney admitted in New York and also a member of the Shinnecock Indian Nation. (Stip. No. 92.) The 1978 Memo was prepared by, or on behalf of, the Shinnecock Tribe, and its submission was authorized by the Nation. (Stip. No. 93.) The 1978 Memo does not suggest that either the Ogden Deed or the Topping Deed was void, invalid, or illegal. (T229.) To the contrary, in the 1978 Memo, the Shinnecock Nation acknowledged the validity and legality of the Ogden Deed and the Topping Deed by stating that "the Tribe's domain to the west of Canoe Place was conveyed to non-Indian individuals in 1659, 1662," and also that "[t]he tribal territory to the west of Canoe Place was subsequently conveyed to non-Indian individuals by deeds of 1659 and 1662." (T229, at 8, 16.)

## I. THE ORAL TRADITION OF THE NATION REGARDING WESTWOODS

The Court has also examined the oral tradition of the Nation regarding Westwoods. During the course of a Shinnecock tribal meeting held on February 4, 2003, Kevin Eleazer, a former Shinnecock Tribal Trustee, stated that "we're not even sure if we own the land at West Woods. . . . It was given to us by a millionaire, and yet there was never a deed for that." (T261, at 42; Tr. 2947-48.)

Defendant Mr. Gumbs, Chairman of the

Shinnecock Tribal Trustees, admitted that he personally heard Kevin Eleazer's statement at the tribal meeting of February 4, 2003 that Westwoods "was given to us by a millionaire," and that he (Mr. Gumbs) had heard another unidentified tribal member make a statement like that previously and that Kevin Eleazer was reiterating it. (S251, at 249.) Mr. Gumbs admitted that the reason he believes Kevin Eleazer's February 4, 2003 statements about Westwoods were inaccurate is that they were based on statements that Kevin Eleazer had acquired from someone else, who had acquired them from someone else before that, and that as stories go "down the loop" over time, they change. (Tr. 2949; S251, at 249-50.) The passing down of stories or memories, orally, from one person to another, from generation to generation, is precisely how Mr. Gumbs came to his understanding of the oral history concerning Westwoods, through what he was told by Augustus (Gus) Thompson and others. (Tr. 2938, 2846, 2849-54.) Mr. Gumbs's understanding of the reputation in the Shinnecock community concerning Westwoods is that it is "land that we have," that "[i]t's been used in the past for firewood purposes" and "[g]enerally in the community it has been used as a means of survival and as recreation for the community." (Tr. 2846.) The principal source of Mr. Gumbs's understanding and knowledge of Westwoods, particularly its history and the origin of the Shinnecock's rights and interest therein, was Mr. Thompson, who died when Mr. Gumbs was 10 years old, and with whom Mr. Gumbs became familiar through nightly dinners and helping Mr. Thompson on his garbage collection route. (Tr. 2846-49.) Mr. Thompson told Mr. Gumbs that the Tribe "always owned" Westwoods. (Tr. 2854.) The only specific information about Westwoods history that Mr. Thompson told Mr. Gumbs

was that Mr. Thompson pointed out to Mr. Gumbs "indentations" in the land at Westwoods on the north side of Newtown Road that Mr. Thompson believed were for "wiki-ups," which could have been used for shelter or a cellar to store things. (Tr. 2850-52.) Notwithstanding Mr. Gumbs's testimony that Mr. Thompson told him that the Tribe "always owned" Westwoods, Mr. Gumbs acknowledged that he could not say one way or the other whether Lee's 1888 testimony that the Shinnecocks had purchased 50 acres of woodland (*i.e.*, Westwoods) was incorrect. (Tr. 2949-52.) In so acknowledging, Mr. Gumbs conceded the possible validity and veracity of testimony about the origin of Shinnecock ownership of Westwoods that was in direct conflict with his testimony of his understanding of the reputation within the Shinnecock community, based on the Tribe's oral history, of the origin of the Shinnecock's ownership of Westwoods, *i.e.*, that the Shinnecocks "always owned" Westwoods. Mr. Gumbs acknowledges that "once or twice" he has heard members of the Shinnecock Tribe say that they did not believe the Tribe owned Westwoods, but he dismissed those statements simply because one of the persons, when confronted about such a statement made at a tribal meeting, had no explanation of how he arrived at it. (Tr. 2854-55.) No evidence was presented by defendants that Mr. Thompson ever was elected a Tribal Trustee, that he held any other elected or appointed position within the Tribe, that he enjoyed any particular formal or informal status of respect or authority within the Tribe, or that he was ever deemed by the Tribe at any point as knowledgeable on any matter of Shinnecock history, including its oral history generally, or specifically as that oral history relates to the Shinnecock's alleged ownership, use, and/or occupancy of Westwoods. No evidence was presented that

Mr. Thompson's recounting to Mr. Gumbs of his understanding of the Shinnecock's ownership of Westwoods, including the origin thereof, what may have been located at Westwoods over time, and how the Tribe may have used Westwoods over time, represents anything more than the isolated statement, or opinion of one single tribal member, which is entitled to no greater weight, authority, or reliance than the statements about Westwoods from any other tribal member. Mr. Gumbs indicated that his understanding of the source of what Mr. Thompson told him about Westwoods was Mr. Thompson's own experiences going to Westwoods and what "his father had told him." (Tr. 2851.) No evidence was presented by defendants that Mr. Thompson's father was ever elected a Tribal Trustee, that he held any other elected or appointed position within the Tribe, that he enjoyed any particular informal status of respect or authority within the Tribe, or that he was ever deemed by the Tribe at any point as knowledgeable on any matter of Shinnecock history, including its oral history generally, or specifically as that oral history relates to the Shinnecock's alleged ownership, use and/or occupancy of Westwoods.

The Shinnecock Tribe does not have anyone who is designated as the tribal historian. (S249, at 30.) Defendants did not present any evidence that there is any one person who is deemed authoritative within the Tribe with respect to the Tribe's oral history and oral tradition, or is a keeper or custodian of accurate and/or reliable oral history, including as that oral history and tradition relates to the Shinnecock's alleged historical use and occupancy of Westwoods, and the origin of their title to and interest in Westwoods.

In sum, there is no basis to conclude that Mr. Gumbs's testimony about the Shinnecock Nation's oral history concerning the Tribe's purported historical use and occupancy of Westwoods, including the origin of the Tribe's rights in Westwoods, is in any respect more reliable or is entitled to any greater weight than the oral statements about how the Shinnecocks acquired Westwoods through gift or purchase made by persons identified as members of the Shinnecock Tribe, to wit, Kevin Eleazer, Milton Winfield Lee, and Fred Smith.

## J. THE TOWN'S TREATMENT OF WESTWOODS FROM THE STANDPOINT OF GOVERNMENTAL AUTHORITY

### (1) LACK OF PROPERTY TAXES ON WESTWOODS

No property taxes have been assessed or imposed on Westwoods from 1927 to the present, and Westwoods is not listed in any tax records of the Town for the years 1800 through 1926. (Stip. No. 32.) There exists no known evidence that Westwoods ever has been listed as taxable property in any assessment records of Southampton. (Stip. No. 33.) Neither the State nor the Town is aware of any evidence that Westwoods ever has been listed in any assessment records of Southampton as anything other than tax-exempt Indian land. (Stip. No. 34.) The relevant Suffolk County Tax Maps describe both the Shinnecock Reservation and Westwoods as "Shinnecock Indian Reservation." (D232; D156d.)

### (2) THE CANOE PLACE DIVISION

As set forth below, the Southampton proprietors laid out in or about 1738 a 3000-4000 acre subdivision of property consisting

of 39 numbered lots, which includes at least a portion of Westwoods within its boundaries (the "1738 Canoe Place Division" or the "Division"), and there is no documented record of any objection or challenge to the laying out or allotment of the Division.

### (A) THE LAYING OUT, ALLOTMENT, AND BOUNDARIES OF THE CANOE PLACE DIVISION OF 1738

In or about 1738, Southampton proprietors laid out a 3000-4000 acre subdivision of property known as the "Canoe Place Division" of the Quaga purchase, consisting of 39 numbered lots, running from "Jeremiah Culver's land" on the east, to "Red crick" on the west. (T97; Martin A. Read, L.S., *The Location of the "Westwoods" Parcel Relative to 1738 Canoe Place Division*, Barrett, Bonacci & Van Weele, P.C., June 28, 2006 (T210), at 1-2; T12, at 68-70; Tr. 971-72, 1268-69.) The surveying and laying out of the 1738 Canoe Place Division is reflected in a portion of Town records dated March 27, 1738, entitled "A Return of the Canoe place Division," which also provides a description of the lands constituting the Division. (T210, at 1-2; T97.) The 1738 Canoe Place Division is described in "A Return of the Canoe place Division," (T97), as being bounded southerly by the highway running "from Canew place Gate to tianah," northerly by "the beach from Conew place pond on the north side to Red crick gut," westerly "on a direct line northwardly to a fresh pond near Red crick the southward part thereof to [be] a tree marked with No. 38, by the pond, and still running northward to Red crick and so along the branch and by the side of the crick to the north sid[e]," and easterly by "Jeremiah Culvers land which he bought in said Purchas at the South end butting up on Quaga Road, and the north end butting on the beach." (T97, at 123-

24; T210, at 1-2; Tr. 1268-69.)

Defendants' title abstraction and examination witness, Mason Haas, admitted that according to Town Exhibit 215, the boundaries of the 1738 Canoe Place Division were north by Peconic Bay, south by Montauk Highway, east by Canoe Place Pond, and west by Red Creek. (T97; Tr. 3041.) Using modern-day landmarks, the Division is generally bounded on the south by Montauk Highway, on the north by Great Peconic Bay, on the west along a line running from Tiana Creek northerly to Red Creek, and on the east by a north-south line in the vicinity of the present day Shinnecock Canal. (T210, at 1-2; Tr. 1269.) The dotted line on Town Exhibit 217, created by plaintiffs' expert land surveyor, Martin A. Read, depicts accurately the northerly, southerly, and westerly boundaries of the 1738 Canoe Place Division, as described in "A Return of the Canoe place Division," (T97), superimposed on an enlarged portion of the 1894 Beers Atlas Map that depicts the westerly portion of Southampton. (T217; T210, at 1-2; Tr. 1271-72.) Although Mr. Read could not locate the easterly boundary line of Lot No. 1 of the Division with a degree of specificity that would have allowed him to plot it on Town Exhibit 217, he was able to determine that the approximate eastern boundary of the Division, using modern landmarks, was in the vicinity of the Shinnecock Canal. (T217; Tr. 1272-73; T210, at 2.)

The 1894 Beers Atlas Map refers on its face to the "Canoe Place Division" and its having been "'[l]aid out in' 1738." (T216; Tr. 1270, 3047-48.) The location of the words "Canoe Place Division" on the 1894 Beers Atlas Map substantiates generally the east-west reach or boundaries of the 1738 Canoe Place Division, as those boundaries are

described in "A Return of the Canoe place Division." (T97; T216; Tr. 1270; T210, at 2.) The Proprietor's Map, (T226), refers to "Canoe Place Division Divided-1738," and the location of those words is consistent with the approximate location of the lands of the Division, as established by the testimony of both Mr. Read and Mr. Haas. (T226; T210, at 1-2; Tr. 1268-73, 3041-42; T97; T215; Tr. 3048.)

The lots described in the 1738 Canoe Place Division are aligned in a northerly/southerly direction. The first 37 lots are numbered consecutively, running from east to west, with Lot No. 1 of the Division being the easterly most lot. (T97; T210, at 1-2; Tr. 1269.) The document "A Return of the Canoe place Division" sets forth a specific acreage for each of the 39 lots of the Division, as well as a description of the physical location of each lot in relation to the other lots within the Division. (T97, at 124-25; Tr. 3045.)

The land located immediately to the east of the eastern boundary of Lot 1 of the 1738 Canoe Place Division is described as being "Jeremiah Culvers [sic] Land." (T97, at 124; Tr. 3045.) That land of Jeremiah Culver was purchased by Culver from the Town prior to the creation of the 1738 Canoe Place Division. (T97, at 124; Tr. 3044-45.)

On April 2, 1739, the Southampton Town Proprietors met to allocate interests in the 39 numbered lots within 1738 Canoe Place Division; that is, to determine which proprietors would obtain rights in which of the 39 lots of the Division (the "Canoe Place Division Lot Drawing"). (D172; T107; T12, at 70). The 39 numbered lots within the Division were allotted to specifically-named Town proprietors during the Canoe Place

Division Lot Drawing. (D172; T97; T107.) For each of the 39 lots in the 1738 Canoe Place Division, the Canoe Place Division Lot Drawing identifies one or more named individual Proprietors of the Town who received interests or allotments (expressed in terms of "fifties" or portions thereof) in said lots. (D172; T107; Tr. 3045-46.)

None of the individuals (each, an "Allottee") whose names appear in the Canoe Place Division Lot Drawing found within the *Third Book of Records of the Town of Southampton, Long Island, N.Y. with Other Ancient Documents of Historic Value*, at 129-32, were members of the Shinnecock Tribe. (Stip. No. 79.) There is no documented record of any objection or challenge by or on behalf of the Shinnecock Tribe of Indians to the laying out or allotment of the 1738 Canoe Place Division. (Stip. No. 80.)

(B) WESTWOODS GENERALLY IS SITUATED WITHIN THE 1738 CANOE PLACE DIVISION

The lands that were part of or the subject of the 1738 Canoe Place Division were located exclusively to the west of Canoe Place; that is, using modern landmarks, the lands of the Division were situated entirely to the west of the modern day Shinnecock Canal. (T97; T215; T216; T217; T226; T210, at 1-2; Tr. 1268-73, 3041-42, 3047-48.) Westwoods is located entirely to the west of Canoe Place, that is, to the west of the modern day Shinnecock Canal. (T214; Stip. Nos. 16, 35, 36.) Westwoods is generally located within the boundaries of the 1738 Canoe Place Division as they were described by plaintiffs' expert Mr. Read, with recourse to modern

landmarks.[30] (T214; T97; T210, at 1-2; T217.) The Court found Mr. Read's testimony to be credible, as supported by his extensive analysis of various documents including deed histories and maps, that at least a portion of Westwoods, namely some portion of Westwoods that is north of the Milton Reiner Property as it runs from west to east, lies within Lot No. 2 of the 1738 Canoe Place Division and that no portion of Westwoods lies west of the westerly boundary of Lot No. 4 of the Division.[31] (T210, at 1, 5-6; Tr. 1267-68.)

Although Mr. Haas contends that the Canoe Place Division was simply a proposal that was never implemented (Tr. 3042-43, 3055), the Court rejects that opinion as contrary to the historical record – including land records, maps, and deeds – which support the conclusion that the Canoe Place Division was executed. (T97, T107, T215, T216, T226; T210, at 5; D158D, D159C, D161C, D166C; Tr. 3042-55.) The inability to locate a subdivision map, or to locate deeds from the Trustees of the Town to any of the Allottees of the 39 lots within the Division, are not sufficient to ignore the compelling evidence that the Division existed and was executed.

In addition, deeds within the chains of title for property adjoining Westwoods which refer to Westwoods as "Indian land," "Indian reservation," or "Land of the Shinnecock Tribe of Indians," make up the majority of the evidence that Mr. Haas cites to support his opinion that the Shinnecocks have owned Westwoods for the entirety of the existence of recorded land title records within the Suffolk County Clerk's Office. (D157, at 1-20; D154, at ¶¶ 8-10; Tr. 3024-27.) However, deeds for properties adjoining Westwoods also contain some references that are more ambiguous as to the purported Shinnecock ownership of Westwoods, including "Indian land, so-called," "so called Indian Land," "land now or formerly of the Shinnecock Tribe," "land now or formerly of the Shinnecock Indian Tribe," "land now or formerly of The Shinnecock Indian Reservation," "lands reputed to be Indian Lands," "land now or formerly of

---

[30] Mr. Haas admitted that he had testified under oath at his deposition in this action that Westwoods is located within the lands that were the subject of the 1738 Canoe Place Division. (Tr. 3041-42.)

[31] It should also be noted that Town Exhibit 111 is an excerpt of the Southampton Town Records from 1795, depicting a plan for the laying out of a road across the 1738 Canoe Place Division. (T111; Tr. 3065-66.) Town Exhibit 111 refers to a highway running "from the Canoe place ditch at the Western Boundary of the Indian Land to the Said Red Creek Island Road." (T111; Tr. 3065-66.) According to Mr. Haas, Exhibit 111 relates to the laying out of a portion of Newtown Road, and at no point in history is he aware of a time when Newtown Road began at Westwoods. (Tr. 3065-67.) Mr. Haas admitted that if one assumes that the "Canoe Place Ditch" referenced in Town Exhibit 111 is located where the modern-day Shinnecock Canal is located, the reference in Town Exhibit 111 to "Indian land" could not be a reference to Westwoods. (Tr. 3067.) The Canoe Place Ditch is the place where Indians formerly carried their canoes between Shinnecock Bay and the Great Peconic Bay, and was located where the modern day Shinnecock Canal is situated. (Stip. No. 35; T12, at 76-78.) Thus, the reference in this 1795 document to "Indian Land" does not appear to be a reference to Westwoods, but instead appears to be a reference to the 1703 Lease Lands, *i.e.*, the lands situated exclusively to the east of

Canoe Place, which were the subject of the 1000 year lease. (T73; T12, at 52-57; Tr. 2755.)

Trustees of the Shinnecock Tribe," and "what is known as Indian land." (D157, at 2-8, 12-13, 15-19; Tr. 3027-29.)

In any event, Mr. Haas's opinions regarding ownership of Westwoods are limited to the period from 1845 going forward. (Tr. 3030.) In other words, Mr. Haas admitted that there is no reliable documentary evidence of Shinnecock ownership of Westwoods prior to 1845 and that he found nothing in his title work in this case to indicate any interest that the Shinnecocks had in Westwoods prior to 1845. (Tr. 3030.) Thus, he acknowledged that there is nothing in his opinions that is inconsistent with the position that the Shinnecock Tribe acquired an interest in Westwoods in or around 1808. (Tr. 3031.)

### (3) SOUTHAMPTON'S HISTORIC REGULATION OF TIMBER RESOURCES

At various times during the 18th century, the Southampton Trustees regulated timber resources throughout the Town, as well as the rights of the Shinnecocks to cut timber. (T12, at 62-68; Tr. 925-32.) For example, by orders of the Southampton Trustees, dated May 5, 1741, April 2, 1745, and April 1, 1746, no timber was permitted to be cut or carted in Shinnecock Great Neck, and Sebanack Great Neck, both of which locations are situated within the 1703 Lease Lands, east of Canoe Place. (T12, at 63; T88, at 6; T89, at 34; T90, at 44; T199; Tr. 925-29.) By order of the Southampton Trustees, dated March 5, 1747, no "green timber" was to be cut or carted "[i]n or upon any part of the Indian Land," i.e., the 1703 Lease Lands. (T91, at 55; T12, at 63; Tr. 927.) By order of the Southampton Trustees, dated July 3, 1744, the Shinnecocks were granted "a mile of timber" "on lands "from the Conueplace Eastward," through a

50-year lease to the Indians. (T92, at 26; T12, at 64.) By order of the Southampton Trustees, dated June 2, 1747, the Shinnecocks were granted "all the timber in Shenecock Great neck . . . and also all the timber in Sebonack neck." This order also provided that the timber granted to the Shinnecocks should "Ly . . . from the Conneu-place ditch Eastward as far as the Coldspring . . . ." (T93, at 57; T12, at 64-65.) The area of timber granted to the Shinnecocks by the aforesaid order of June 2, 1747 was in close proximity to the Shinnecocks' main village at Cold Spring (Sebonack). (T93; T12, at 64-65; T13, at 25-27, 32-35.) By reason of a growing shortage of timber resources, and the sale of timber by individual Shinnecocks to local townsmen, 32 Shinnecocks entered into a mutual agreement dated June 12, 1764, which provided, inter alia, that "[n]either Shall any Indian or Squaw Sell any timber on penalty of Eight Shillings for any trees so Sold. . . ." (T94; T12, at 65; Tr. 930-31.) By order of the Southampton Trustees, dated April 30, 1782, it was recognized that the Shinnecocks had complained to the Trustees that agreements not to sell timber, such as the foregoing agreement dated June 12, 1764, had been "broken thrugh," and the Shinnecocks had made an application to the Southampton Trustees for aid and assistance in fostering "a Strict Observance of sd. Agreement." (T95, at 384.) The April 30, 1782 order prohibited the cutting or carting of wood "off any part of the Indian land," except for the consumption of persons having an interest in such lands. (T95, at 384-85; T12, at 66-67; Tr. 931-32.) By order of the Southampton Trustees, dated April 2, 1754, no timber was to be cut or carted off "any part of the undivided land westward of Canuplace on penalty of six shillings. . . ." (T176, at 108; T12, at 65; Tr. 933-34.) By a second order of the Southampton Trustees, dated April 2, 1754,

there was to be no flaxseed "soed on any part of the Indian land." (T176, at 108.) By distinguishing between the "Indian land" and the "land westward of Canuplace" in the two orders of the same date, it appears that the Southampton Trustees viewed the "Indian land" to be situated exclusively east of Canoe Place, while the lands west of Canoe Place were not considered "Indian land." (T176, at 108.)

### K. THE NATION'S TREATMENT OF WESTWOODS FROM THE STANDPOINT OF GOVERNMENTAL AUTHORITY

#### (1) USE OF WESTWOODS FOR FIREWOOD AND RECREATION

Defendants are aware of no written document reflecting that the Shinnecock Tribe and/or its Trustees ever made any allotments of land within the borders of Westwoods to any member of the Nation. (Stip. No. 31.) Tribal Chairman Mr. Gumbs, who claimed to be knowledgeable about the reputation within the Shinnecock community concerning the history of Westwoods, testified at trial that as far as he knew, no portion of Westwoods had ever been allotted to a tribal member in the history of the Tribe. (Tr. 2835, 2845, 2937, 2939-40.) Mr. Gumbs admitted that the Shinnecock Tribe has no written tribal laws at all, including any concerning the use of Westwoods, or any environmental standards that are referenced in the agreement originally entered into between the Shinnecock Gaming Authority and Ivy Ong, discussed *infra*. (D237, at section 6.7; Tr. 2886-87, 2947, 2938-40.)

Mr. Gumbs also admitted that, according to Tribal history, Westwoods is to be used for firewood and recreational purposes. (Tr. 2938.) The historical use of Westwoods only for firewood and recreational purposes is consistent with the testimony of other Shinnecock Trustees. (S249, at 39; S248, at 198.) No permanent structure currently exists on any part of Westwoods. (Stip. No. 19.) Except for the erection of gates across roadways, the Shinnecock Tribe has never fenced in the Westwoods property. (D251, at 262-64; S248, at 161.) Defendants Messrs. Eleazer and Bess testified that the Shinnecock Tribe has never adopted or enacted any written rules or regulations regarding the use of Westwoods by Tribe members. (S249, at 100; S248, at 160-61.) To the extent that the Shinnecocks used the area now known as Westwoods in the 19th and 20th centuries, they used it primarily as a timber lot for cutting wood and timber. (Tr. 2782.)

As stated by Tribal Trustees, the purpose of the development of a casino at Westwoods would be for the Tribe's economic development, that is, to meet the financial needs of the members of the Tribe, and to enjoy the economic success achieved by other Indian communities that engage in gaming. (Tr. 2880-82; S249, at 108-09.)

#### (2) ENCROACHMENTS ON WESTWOODS

Mr. Gumbs admitted that the Shinnecocks have been aware of the fact that the driveway of a neighboring/adjoining property owner currently encroaches on Westwoods. (Tr. 2941-42; S251, at 224-26.) Specifically, Mr. Gumbs acknowledged that a former owner of that encroaching driveway, Mr. Raynor, was obligated to pay rent to the Shinnecocks for the use of the portion of Westwoods on which the driveway encroached, but stopped remitting payments. (Tr. 2941-42; S251, at 224-25.) Mr. Gumbs conceded that the driveway has continued to encroach on Westwoods since Mr. Raynor sold his

property. (Tr. 2942; S251, at 226.) Mr. Gumbs admitted that the Shinnecock have never commenced a lawsuit against Mr. Raynor or the current owner of the encroaching driveway, seeking payment of rent or the removal of the encroachment, and that Mr. Gumbs does not have any knowledge that even so much as a letter from the Shinnecock was sent to either Mr. Raynor or the current owner of the property demanding the removal of the encroaching driveway.[32] (Tr. 2942-43; S251, at 226-27.)

## L. SOUTHAMPTON ZONING LAW

In 1957, when Southampton initially adopted its zoning code, Westwoods was zoned "C residential," which was a single-family residential district, with a minimum lot area per dwelling of 15,000 sf. (T5; T265; Tr. 94-97.) In 1972, pursuant to the Town's 1970 Comprehensive Plan, the Town re-zoned Westwoods "R-60," which is a residential classification for a single-family residence with a minimum lot size of 60,000 sf. (T6; T266; Tr. 98-100.) In 1984, Southampton re-zoned Westwoods "R-80," which is a

residential classification for a single-family residence with a minimum lot size of 80,000 sf. (T264, T312; Tr. 100-03.)

Former Southampton Town Planner David Emilita testified that the R-80 zoning classification of Westwoods, as adopted in 1984, was omitted from the Town's subsequent zoning map, and as part of the Town's "Master Plan Update Number Three of 1985" it was proposed that Westwoods be reclassified from an R-80 zone to an R-60 zone. (Tr. 103-04.) Town Exhibit 9 includes the 1985 recommendation for the rezoning of Westwoods to an R-60 zone, in order to "Replace Omitted Zoning Map Designation." (T9, at third to last page; Tr. 104-06.) The third to last page of Town Exhibit 9, including the words "Replace Omitted Zoning Map Designation," was prepared by Mr. Emilita. (Tr. 105-06.) Mr. Emilita testified that the words "Shinnecock Indian Reservation," which appear on the third to last page of Town Exhibit 9, were placed there by him, "[f]or identification," and that such words were intended to show that Westwoods was owned by the Shinnecocks, and that the words had no zoning significance. (Tr. 107-08; 121.)

A public hearing was held in Southampton Town Hall in 1985, concerning proposed updates to the Town's Master Plan, including the designation of Westwoods as property bearing an R-60 zoning classification. (T8; Tr. 108-09.) A letter authored on behalf of the Shinnecock Tribe, which requested that the Town remove markings from the zoning map that showed the Town's zoning authority over the Shinnecock's lands, was read into the public record at this 1985 public hearing. (T8, at 11-13; Tr. 109-12.) Southampton did not grant the Shinnecock's request that it remove markings from the zoning map that showed

---

[32] On the issue of governmental authority, there is an unpaved parking area at Westwoods used by the Shinnecocks, and Mr. Gumbs testified that no Town or New York official ever objected to the clearing of land for a parking lot. However, Mr. Gumbs admitted that the parking lot was created "before his time," that he does not know when the parking lot was created, and that he does not know whether the Town was aware that the parking lot was being created. (Tr. 2940-41.) No evidence was presented at trial that Southampton or New York was ever aware that land was cleared for the creation of the parking lot on Westwoods, or an awareness that the parking lot on Westwoods, in fact, existed. Mr. Gumbs also admitted that the parking area at Westwoods is not related to any commercial activity by the Tribe. (Tr. 2941.)

the Town's zoning authority over the Shinnecock lands. (Tr. 112.) In 1986, the Town approved the proposed changes that appeared in Town Exhibit 9, and re-zoned Westwoods R-60, through the enactment and adoption of Local Law No. 7 of 1986. (T11; Tr. 113-14, 241-42.)

Since the enactment of Local Law No. 7 of 1986, there have been no Southampton Local Laws that have affected or changed the R-60 zoning designation of Westwoods. (Tr. 242-43.) Westwoods currently remains zoned R-60 by the Town. (Tr. 240-42; T11.) As an R-60 designated parcel, the use of Westwoods is limited to single-family residential use. (T267; Tr. 114, 245.) A gaming casino is not a permitted use in an R-60 zone. (T267; Tr. 245.) A gaming casino is not a permitted use anywhere in the Town. (T267; Tr. 245.) A gaming casino is not authorized by Southampton zoning law. (T267; Tr. 246.)

Mr. Emilita testified that there is no impact, from a zoning standpoint, resulting from the fact that a Town zoning map shows no zoning classification for Westwoods. (Tr. 104.) At all times from 2003 to the present, § 330-184(I) of the Southampton Town Zoning Law provided that "[n]o regrading, clearing, tree removal or any other work in preparation of future use of a site may take place until site plan approval or written permission has been received from the Planning Board." (T267, at 330.) At all relevant times, the operation of a gaming casino and related commercial structures and activities, such as hotels, restaurants, and retail stores have not been identified as "permitted" or "special exception" uses within any "Country Residence" or "Residence" zoning districts in the Table of Use Regulations appearing at § 330-10 of the Town of Southampton Zoning Law, including R-60. (T267; Tr. 246-47.)

To date, neither the Shinnecock Tribe, nor any representative, Trustee, or any other person or entity acting on its behalf has applied for or received a bingo or games of chance identification number from the Board. (Stipulation, dated January 17, 2007, Stip. No. 5.) To date, the Town has not issued any state-authorized license to any defendant to permit gaming within Westwoods. (Stipulation, dated January 17, 2007, Stip. No. 6.)

Town of Southampton Planning and Development Administrator, Jefferson Murphree, testified that no commercial structure can be constructed within the Town in compliance with the Town Code in the absence of a Town-issued building permit. (Tr. 247-48.)

Neither "Shinnecock Indian Reservation," nor "Indian Reservation," nor "IND-RES" is a zoning district or classification within the Town. (Tr. 116-17, 235-36, 244, 269; T267.) Mr. Murphree testified that the labeling of Westwoods as "Indian Reservation" or "IND-RES" suggests nothing as far as the zoning of Westwoods is concerned. (Tr. 244.) It is the Town's practice to zone all lands within the Town.[33] (Tr. 236, 261, 266.) Shinnecock

----

[33] The May 20, 1987 letter from then-Southampton Town Attorney Fred Thiele to the New York Department of State ("NYSDOS") refers only to the Town's then-existing policy concerning its zoning laws with respect to the Shinnecock Reservation; it makes no explicit or implied reference to Westwoods. (D229.) Mr. Thiele's letter also states unequivocally that "the Town of Southampton zones all the lands in the Town excluding incorporated villages," (D229, at 1), and this is consistent with the trial testimony of Mr. Murphree. (Tr. 236, 261, 266.) There are no properties within Southampton that do not carry a zoning classification assigned by the Town. (Tr.

Trustees Messrs. Gumbs and Eleazer admitted that they were aware that Westwoods was assigned a zoning classification by the Town.[34] (Tr. 2943; S249, at 12, 98-99.)

## M. CURRENT TOPOGRAPHY AT WESTWOODS

The Westwoods project site is bordered to the north by the Great Peconic Bay, to the south by the Sunrise Highway, and to the west and east by residential areas. (S125, at 40; Tr. 1842; T1; T2; T3.) The sections of the Westwoods parcel north and south of Newtown Road generally include hilly terrain with centrally-located high points. The north parcel includes the bluff topography sloping towards the Great Peconic Bay (to the north) and generally towards Newtown Road (to the south). The south parcel includes topography generally sloping towards Newtown Road (to the north) and towards "Canoe Place" (to the southeast). (S125, at 40.)

The topography reflects that Newtown Road is a relative low point between higher elevation lands on the north and south parcels, and surface runoff is directed towards Newtown Road from both parcel sections. (S125, at 40.) The project site is located within Seismic Zone C, which is identified as a region of intermediate seismic hazard. (S125, at 9; S150.)

The portion of Westwoods located on the

---

236.) Because the 1987 letter addresses the Shinnecock Reservation, the Court views it as having little, if any, probative value on the issues related to Westwoods.

[34] Shinnecock Trustee Mr. Bess testified that Westwoods was assigned a zoning classification, but he believed it had been removed. (S248, at 210-12.)

north side of Newtown Road, along the shore of the Great Peconic Bay, contains a coastal bluff approximately 50 to 70 feet above mean sea level (as defined in the National Geodetic Vertical Datum ("NGVD") 1929). (S125, at 9; Stipulation dated January 16, 2007, Stip. No. 6.) The coastal bluff, one of the unique and sensitive environs that contribute to the overall community character of the Town, acts as a natural protective barrier that absorbs wave energy and mitigates impacts from erosion and high water, and also provides a source of material for other natural protective features, such as beaches and dunes. (S125, at 10; Tr. 1842.)

Proposed development along the waterfront area within the Town is reviewed by the Town for consistency with these local community waterfront objectives. (S125, at 10.) Soils underlying Westwoods are part of the Plymouth-Carver soil association. Characteristic of the Pine Barrens, the Plymouth-Carver soils are distinguished by their coarse texture, which allows for rapid permeability. (S125, at 11.) The soils at Westwoods and their underlying geology allow for a renewable source of fresh ground water, which recharges the aquifer through percolation of rainwater or snowmelt, which is an important characteristic for an area served by a ground-water-based sole source for the municipal water supply system. (S125, at 11.)

The high soil permeability at Westwoods also increases vulnerability to contamination by septic systems, spills, and other development-related discharges. (S125, at 11, 52.) Westwoods is characterized by undulating topography with spot elevations ranging from a high of 92 feet NGVD, on the southern Westwoods parcel, elevation of 37 feet along Newtown Road, and elevation of 50

41

feet on the northern Westwoods parcel. (S125, at 12; S166.)

## N. Current Environmental Resources and Conditions in Southampton Generally and at Westwoods

### (1) Water Resources

Southampton, as well as the rest of Long Island, obtains its water supply solely from ground water sources, which consist of three primary aquifers: the Upper Glacial, Magothy, and Lloyd aquifers. (S125, at 12; Stipulation, dated January 16, 2007, Stip. Nos. 7, 9-10.) Infiltration from precipitation, runoff, and snowmelt are the only sources of recharge to these aquifers, and where no development has occurred, approximately 50% of the precipitation that falls on the land could be expected to recharge the underlying aquifers, with the remainder of the precipitation lost through evaporation and plant transpiration. (S125, at 13; S162, at 9-11.)

Where development has resulted in impervious surfaces (*e.g.*, rooftops, parking lots, streets, and sidewalks), a greater percentage of precipitation becomes overland flow – runoff – before infiltrating to the aquifers. (S125, at 13.) Most of the surface waters on Long Island are fed from the ground water. (S125, at 13.) Eight specific hydrogeologic zones based upon different flow patterns have been identified on Long Island, and Southampton is located within Zones III, IV, V, and VI. (S125, at 14, and Figure 6.)

Westwoods is located in hydrogeologic Zone IV, and adjacent to Zone III. (S125, at 14 and Figure 6; D298.) Zone III is an area

that has good ground water quality in both the Upper Glacial and Magothy aquifers. (S125, at 14.) Zone IV encompasses the northern and eastern portion of the South Fork, and is characterized by shallow flow systems that discharge directly into streams and marine waters. (S125, at 14 and Figure 6; S162, at 9; D298.)

There are no named streams, ponds, or lakes on Westwoods, but nearby or adjacent water bodies include: (a) Great Peconic Bay (approximately 19,100 acres), which borders the site to the north; (b) Shinnecock Bay (approximately 4,550 acres), which is located approximately one-half mile to the southeast; (c) Shinnecock Canal, which connects Great Peconic Bay and Shinnecock Bay, is located approximately one-quarter mile to the east at its closest point; (d) Squire Pond (approximately 19 acres), which is located approximately one-quarter mile to the northwest; and (e) Flanders Bay and Reeves Bay (approximately 2,600 acres), which are located approximately 7 miles to the west, at the westernmost area of the Peconic Estuary. (S125, at 15.)

Westwoods is located within the watershed of the Peconic Estuary. (S125, at 15; Stipulation, dated January 16, 2007, Stip. No. 15). Storm water and snow-melt water runoff in the watershed that does not percolate to ground water is conveyed by overland flow to Great Peconic Bay, and runoff from Westwoods and other lands within the watershed have a cumulative qualitative and quantitative impact on the Great Peconic Bay. (S125, at 15.) The Great Peconic Bay is a part of the Peconic Estuary, which separates the North and South Forks of the eastern end of Long Island; the Peconic Estuary consists of over 100 bays, harbors, and tributaries, and includes over 128,000 acres of land and

120,000 acres of surface waters. (S125, at 15.) The Peconic Estuary is part of the Natural Estuary Program ("NEP"), which has designated it as an "Estuary of National Significance." (S125, at 15.) The portion of the Westwoods property along the shoreline of the Great Peconic Bay is within a flood zone area. (S125, at 17 and Figure 9; S137.) The Great Peconic Bay and the Shinnecock Canal have been mapped by the DEC as tidal wetlands (littoral zone). (S125, at 19; Stipulation, dated January 16, 2007, Stip No. 13.) Westwoods includes tidal wetlands along its Great Peconic Bay shoreline. (S125, at 19; Stipulation, dated January 16, 2007, Stip. No. 13.) A federal National Wetland Inventory map published for the Mattituck quadrangle contains the Westwoods property and identifies wetland habitats on the Westwoods property along the Great Peconic Bay shore that coincide with the United States Geologic Survey mapping of hydric soils, also an indicator of potential wetlands. (S125, at 19-20.)

The Coastal Area mapped by the NYSDOS includes a portion of the Westwoods property north of Newtown Road within the coastal zone for purposes of the federal Coastal Zone Management Act and related New York statutes. (S156; S125, at 19-20.)

(2) AIR RESOURCES

Long Island, including Suffolk County, is in the Ozone Transport Region and is within a moderate non-attainment zone for nitrogen dioxide and ozone, two substances for which National Ambient Air Quality Standards ("NAAQS") have been set. (S125, at 20-21.) Long Island, including Suffolk County, is in the non-attainment zone for particulate matter (dust) below 2.5 microns in size, a substance for which a NAAQS has also been set. (S125, at 21.)

(3) BIOLOGICAL RESOURCES

Terrestrial habitats contribute to the area's community character, as well as the well-being of the area's native species. (S125, at 21.) Westwoods is covered primarily by a "Pitch Pine – Oak Forest." (S125, at 21; Tr. 1842.) Extending shoreward (from north to south), Westwoods has three primary zones – coastal, transitional, and terrestrial woodlands – that contain the following ecological habitat types: maritime beach, maritime shrubland, maritime oak forest, pitch pine slope, pitch pine oak forest, successional maritime forest, successional old field, and maritime pitch pine dune woodland. (S125, at 21; Tr. 1842-43.)

The "maritime oak forest" habitat located on Westwoods has a high ecological value; the habitat "maritime pitch pine dune woodland" that is on Westwoods has been assigned the highest value available within New York for a habitat site because this habitat is especially vulnerable to extinction. (S125, at 21-22; S152, at 83, 123.) There is potential habitat on the bluff area located on the northern Westwoods parcel for a plant species known as the Nantucket juneberry, also known as the Nantucket shadbush (*Amelanchier nantuckentensis*), an endangered species. (S125, at 27, Appendix B.)

Protection and sustainable management of the Peconic Estuary and its resources – including fish and shellfish – are critical to the community character and economic well-being of eastern Long Island. (S125, at 27-31.) The Peconic Estuary, to which Westwoods is hydrologically connected, is threatened by algal blooms; nutrient pollution

43

arising from fertilizer runoff; infiltration from septic systems; storm water runoff and wastewater discharges; degradation and destruction of natural habitats on land adjoining the estuary; pathogen contamination of shellfish beds; and toxic chemical pollution from human activities. (S125, at 28-30.)

Although defendants' expert, James Mansky, states that Westwoods "is classified as Coastal Oak – Heath Forest in accordance with the document *Ecological Communities of New York State*," the Court credits the testimony of plaintiffs' expert, Robert Grover, that the correct habitat classification of the Westwoods property is pitch pine – oak forest. (S226, at 2; D259, at ¶ 11; Tr. 1954.) Westwoods is part of a continuous pine barrens habitat that includes the Central Pine Barrens and possesses the same habitat characteristics as the pitch pine – oak forest that comprises much of the Central Pine Barrens.[35] (S226, at 2-3; Tr. 1955.)

The forest on Westwoods can be characterized as one in excellent condition that exhibits the appropriate stratification and structure of a pitch pine-oak forest, has old-growth trees 90 to 110 years of age, does not have significant incursions of invasive species, is relatively large and unfragmented by Long Island standards, and supports many wildlife species indigenous to this habitat type. (S226, at 4; S125, at 25-26; Tr. 1954.) Large numbers of small trees, mostly oaks, that were less than four inches, as measured in diameter at breast height ("DBH"), are present at Westwoods. (S226, at 4.) The presence of small trees at Westwoods is evidence that

forest regeneration is actively taking place as older trees are lost to senescence, disease, and blowdown, and thus is an indication of good forest structure and vitality. (S226, at 4; Tr. 1955.) Hundreds of small pitch pines and dozens of small oak have become established in the previously cleared five to ten acre area at Westwoods, demonstrating that the cleared area is rapidly undergoing reforestation. (S226, at 4.)

Approximately 30 species of birds were identified on Westwoods during two short visits by Mr. Grover to Westwoods on April 12, and August 9, 2006. (S226, at 5; Tr. 1959.) The New York State Breeding Bird Atlas divides the state into survey blocks of nine square miles, and Block 7052A, which includes the Westwoods property, covers much of the area known as Hampton Bays. (S226, at 5.)

Interim data for 2000-2005 shows 73 breeding species for the survey block, of which at least 40 of these species nest in the type of habitat provided by the Westwoods property; since there is ample woodland habitat on the property, it is reasonable to assume that all or most of these species use the property for breeding purposes. (S226, at 5-6, Exhibit 1; Tr. 1958-59.)

The Westwoods property also supports habitat for New York Special Concern Species, including the Eastern Box Turtle. (S226, at 5-6; Tr. 1955-56.) Other special concern species, including the Sharp-shinned Hawk and Cooper's Hawk, would be expected on this property, based on habitat, during the winter. (S226, at 6.)

---

[35] In any event, this dispute regarding classification is not critical in the Court's analysis regarding the impact on the forest on Westwoods from the development of the property.

Hospitals/medical centers that serve the eastern Long Island area, including the area of Westwoods, are Southampton Hospital (about 7.5 miles east, in Southampton); Peconic Bay Medical Center, formerly Central Suffolk Hospital (about 8 miles northwest, in Riverhead, New York); Eastern Long Island Hospital (about 30 miles northeast, in Greenport, New York); and University Hospital (about 33 miles northwest, at SUNY Stony Brook, New York). (S125, at 37.) Ambulance service for the area is provided by the Hampton Bays Volunteer Ambulance Corp, Inc., Flanders-Northampton Volunteer Ambulance Co., Inc., Riverhead Volunteer Ambulance Corps, Inc., Southampton Town Volunteer Ambulance Corps., and East Quogue Fire Department (a volunteer fire department). (S125, at 38.) Fire and rescue service for the area is provided by the following: Hampton Bays Fire Department (about 2 miles southwest); Flanders Fire Department (about 4 miles west); Southampton Fire Department (about 7.5 miles east); and Riverhead Fire Department (about 8 miles west). (S125, at 38.) The Town of Southampton Police Department would likely be the first responding agency in the event of a police emergency at Westwoods. (S125, at 38.)

Westwoods is located within the Hampton Bays Water District ("HBWD"). (Stipulation, dated January 16, 2007, Stip. No. 8.) The HBWD supplies potable water for commercial and domestic use, and also provides fire protection water to businesses, schools, municipal agencies, apartment complexes, and private homes in the community of Hampton Bays. (S125, at 39.) As an undeveloped property, there is no current water demand on Westwoods. (S125, at 39; Stipulation, dated January 16, 2007, Stip. No. 11; Tr. 1843.)

Westwoods is not served by a community sewer system or municipal wastewater treatment plant, and in the absence of a community sewer system, residential, commercial, and industrial businesses must provide for their own wastewater treatment. (S125, at 40; Tr. 1843.) Two options for wastewater disposal at Westwoods are either a subsurface (on-lot septic tank with a leach field) or on-site wastewater treatment facility. (S125, at 40.)

As an undeveloped site, there is currently no demand for electrical power at Westwoods. (S125, at 41; Tr. 1843.) An electrical substation with a capacity of approximately 10 megawatts ("MW") is located south of Sunrise Highway about one-quarter mile from Westwoods. (S125, at 41; D248.)

A high pressure natural gas line is located approximately one-half mile southeast of Westwoods, and runs north along Newtown Road and terminates near Holtzman Drive southeast of Westwoods. (S125, at 41; Stipulation, dated January 16, 2007, Stip. No. 19.) As an undeveloped site, there is currently no demand for natural gas at Westwoods. (S125, at 41; Stipulation, dated January 16, 2007, Stip. No. 17; Tr. 1843.)

Because the Town does not provide curbside collection or disposal of solid waste, private collection service companies collect approximately one-half of the residential waste stream and all of the solid wastes generated by commercial, industrial, and non-hazardous institutional entities, as well as farms; large-volume generators must arrange for private haulers to collect and transport

trash, recyclables, and construction/ demolition debris to receiving centers located outside the Town. (S125, at 41.)

## P. SOUTHAMPTON DEMOGRAPHICS AND COMMUNITY CHARACTER

### (1) DEMOGRAPHICS

Suffolk County's population on January 1, 2005 was estimated to be 1,483,396 persons, and is expected to increase between 2004 and 2030 by 19%. (S125, at 42.) In 1962, the County's saturation population was projected to be 3.4 million people, but a much lower saturation population is now expected due to lower average household sizes, zoning changes, land preservation efforts, and other measures taken by Southampton that also are designed to retain community character. (S125, at 42.)

Southampton is the largest and most populated of the five "East End" towns of Suffolk County with a population (as of January 2005) of 58,564 permanent residents, including 504 residents of the Shinnecock Reservation (0.8% of the total Town populace). (S125, at 43.) The Southampton population swells dramatically during the summer tourist season from the July 4th to Labor Day holidays, reaching its peak in July and August at nearly triple the year-round population, with the second-home population comprising the largest component of Southampton's summer population. (S125, at 43; Tr. 1472-73.) Tourism and the vacation home industry drive the Town's economy. (S125, at 43.)

### (2) AESTHETICS

Unimpeded views of the beach along the Great Peconic Bay exist on Westwoods and adjacent properties, and recreational boaters and other users of the Great Peconic Bay can view the coastal bluffs, including the coastal transitional and terrestrial woodland zones. (S125, at 44.) These visual resources are unique and important visual corridors and vistas. (S125, at 44.) The coastal bluff is an important local aesthetic resource that contributes to the overall community aesthetics in the Town. (S125, at 44.) The Sunrise Highway is a Scenic Road Corridor. (S125, at 45.) Ambient sound levels on the Westwoods property are associated with residential activity on the western, eastern, and southern boundaries. (S125, at 45.)

### (3) COMMUNITY CHARACTER

Westwoods is zoned residential 60,000 ("R-60"), and is surrounded by lands zoned as residential 80,000 ("R-80"), "R-60," and residential 15,000 ("R-15"), where 80,000 sf., 60,000 sf., and 15,000 sf., respectively, are the minimum lot sizes in the zoning classification. (S125, at 31-32, 47 and Figure 14; S167; T4.) Southampton's unique scenic quality and sense of place is derived from the interrelationship between rural farmland, areas of undeveloped open space, and the hamlet centers. (S125, at 47.) This rural character, with significant natural and historic resources, is the quality that maintains Southampton's economic vitality as a visitor attraction, as well as an attractive place to live and work. (S125, at 47; S167.) Southampton's zoning is intended to maintain its natural, historic, and scenic resources, green space and recreational areas, and promote affordable housing. (S125, at 34-37; S167.) Southampton's zoning is also intended to maintain a diverse economy that capitalizes upon but does not erode the Town's natural, historic, and scenic resources, and enhance its rural and historic scenery, beach, and

recreational amenities, and cultural and specialty retail amenities, while protecting the established character and the social and economic well-being of both private and public property. (S125, at 35-36; S167.)

## Q. THE NATION'S DEVELOPMENT PLAN FOR GAMING FACILITY AT WESTWOODS

The Gaming Authority is an instrumentality of the Shinnecock Indian Nation. (Stip. No. 49.) The Gaming Authority was formed by the Nation in or about 2003 in order to enter into a contract regarding gaming at Westwoods on behalf of the Nation. (D237; D238; Tr. 2842.) The Gaming Authority entered into a Development/Management Agreement ("Development/Management Agreement") with Ivy Ong and Ong Enterprise, LLC (collectively, "Ong"), dated May 1, 2003, for the development, construction, and operation of a gaming facility at Westwoods. (D237.) The intent of the parties to the Development/Management Agreement was that only the parties to the agreement would have the right to enforce any provisions of the Development/Management Agreement, and in particular, that the State and the Town would not have any right to enforce any provisions of the Development/Management Agreement. (D237, at ¶ 6.7; Tr. 2914-15.) A Closing Letter was executed on or about March 19, 2004, between Ong and Gateway Casino Resorts, LLC ("Gateway"), with the consent of the Gaming Authority, assigning the rights of the developer/manager set forth in the Development/ Management Agreement to Gateway. (D239; Tr. 2924.) An Addendum to the Development/Management Agreement was executed in or about March 2004, by the Nation, between the Gaming Authority and Gateway. (D238.)

Mr. Gumbs negotiated the Development/ Management Agreement on behalf of the Nation and its Gaming Authority. (Tr. 2886.) The Development/ Management Agreement provides for an Initial Facility of approximately 61,000 sf. on a 15-acre tract of land on Westwoods (on the south side of Newtown Road) capable of holding between 900-1000 gaming machines and 60 table games. (D237; D238.) The Development/ Management Agreement also provides the developer/manager a right of first refusal with respect to the expansion of gaming facilities on other portions of Westwoods. (D237, at ¶ 4.4; Tr. 2913-14.) The Gaming Authority, with approval of the Nation, could enter into a contract with another developer for development on those portions of Westwoods not the subject of the Development/ Management Agreement and provide for development on those portions of Westwoods, and it is the position of the Nation that should its at-large council agree, the Nation could develop all portions of Westwoods without regard to any New York or local law. (Tr. 2916.)

The Development/Management Agreement provides that the construction, maintenance, and operation of any gaming facilities at Westwoods would be conducted "in a manner which adequately protects the environment and the public health and safety and for that purpose shall comply with the requirements of all other applicable health, safety and environmental standards enacted by the Tribe" and would comply with "[t]hose standards generally imposed by the laws and regulations of the State relating to public facilities with regard to building, sanitary and health standards and fire safety . . . [and] water discharges . . . ," except that if there are "federal water standards specifically applicable to the Reservation [they] would

preempt such State standards." (S237, at ¶ 6.7.) However, the Nation could excuse compliance with such standards in the future. (Tr. 2915.) Moreover, although the Development/Management Agreement as amended by the Addendum provides for the construction of gaming facilities and related ancillary facilities on 15 acres at Westwoods, the Nation could allow construction of additional facilities at Westwoods on other portions of Westwoods in the future, including portions of Westwoods north of Newtown Road. (S237, at ¶4.4; S238, at (4), (10); Tr. 2929.)

### R. CONFIGURATIONS OF OTHER POTENTIAL CASINO COMPLEXES AT WESTWOODS

The Nation and its Gaming Authority have received several gaming facility configurations ranging from a temporary gaming facility to a multi-component entertainment complex. (S113-16; S118-19.) In the past, the Economic Development Committee of the Nation has considered economic development proposals that include development constructed on portions of Westwoods north of Newtown Road, including the construction and operation of a marina along the north shore of Westwoods in Great Peconic Bay. (S113-16; S118-19; Tr. 2906-08.)

The following components of a casino complex have been identified by developers and others for a casino complex at Westwoods: (a) temporary casino (21,600 sf., including a 1,200-1,300 seat bingo hall); (b) casino (130,000 sf.); (c) theater (3,000 seat, 50,000-60,000 sf.); (4) retail (75,000 sf.); (d) hotels (1,604 rooms), including a 400 room, 6 floor hotel on northern parcel, a 600 room, 4 floor hotel on northern parcel, a 300 room hotel on southern parcel, a 160 room hotel on

southern parcel, and a 144 room hotel on southern parcel; (e) spa (25,000 sf.); (f) convention center (50,000 sf.); and (g) restaurants. (S113-16; Tr. 1840, 1867-69.) The proposed 130,000 sf. casino would contain 3,500 gaming devices and 140 table games, not including "back of the house" space. (S113.)

The Tribe may ultimately construct (or expand) a gaming facility at Westwoods to the maximum extent possible, restricted only by the physical dimensions of the site. (S125, at 1-2; Tr. 1840-41.) Speaking on behalf of the Nation, Mr. Gumbs has said that "[o]nce [the Tribe] get[s] a shovel in the ground we can do whatever we want" when discussing the building of a casino at Westwoods. (Tr. 1479-80.) Westwoods is physically large enough to accommodate a casino and commercial and hotel components as described above, with enough space to allow expansion of the casino to 340,000 sf., a casino complex similar in size to that at Foxwoods in Connecticut that occupies approximately 54 acres. (S125, at 2-3 and Figure 2.)

Win per unit per day ("W/U/D") – how much a gaming device wins per day on average within a gaming facility – is a major factor in determining the potential size of a gaming facility in terms of its overall revenue profitability. (Tr. 1394, 1397.) At a minimum, a casino with a W/U/D within the range of $180 to $240 is financially viable. (Tr. 3216.) It is a conservative conclusion that a stand-alone casino at Westwoods comprising 162,500 sf., including a 130,000 sf. casino and approximately 32,500 sf. of "back of the house" space, with 3,500 gaming devices and 140 table games, would likely have a W/U/D of approximately $300, and would be financially viable. (S1, at 3, 6-8; Tr. 1392-93, 1395-96.)

As concluded by defendants' expert, Steven Rittvo, a casino at Westwoods with 6,500 positions and a 1,000 person hotel would be financially viable and have a W/U/D in excess of $220. (S268; Tr. 3113-15; 3212-13, 3216.) Mr. Rittvo also concluded that a casino in Mastic, New York, just 20 to 25 miles closer to New York City than Westwoods, with 6,500 gaming positions, would likely generate a W/U/D of more than $300 and have an attendance in excess of 7.6 million visitors per year. (Tr. 3228-30; S14, at 2-4; S271.)

The difference in travel time from New York City and other locations west of Mastic to Mastic, as compared with travel time from New York City and other locations west of Mastic to Westwoods – approximately 25 minutes – would not account for a significant reduction in the number of visitors to or the financial performance of a casino at Westwoods as compared to a casino at Mastic. (S14, at 2-4.)

## S. PHYSICAL COMMENCEMENT OF CASINO PROJECT AT WESTWOODS

On or about July 12, 2003, trees and brush were cleared by use of a bulldozer and other construction equipment from a portion of Westwoods located to the south of Newtown Road. (Stip. No. 47.) The clearing of trees and brush within Westwoods, on or about July 12, 2003, was done by the Shinnecock Indian Nation in furtherance of its intention to construct a building on a site within Westwoods located to the south of Newtown Road, in which it intended to conduct gaming. (Stip. No. 48.) Shinnecock Trustee Bess was unable to identify any activity at Westwoods that occurred prior to the clearing of land in 2003 for a casino as to which he believed the Town could have enforced its laws, but did

not. (S248, at 212.) No evidence was presented at trial by defendants that the Shinnecocks had engaged in any activity or use of Westwoods prior to their 2003 clearing of land for a casino with respect to which the Town could have enforced any of its zoning or land use laws, but did not.[36]

Neither the Nation, nor any representative, Trustee, or any other person or entity acting on the Nation's behalf, has done the following: (1) applied for or received site plan approval for any activity at Westwoods from the Town for any purpose at any time (Stip. No. 51); (2) submitted environmental or building permit applications to the Town showing compliance with Town zoning laws, fire code regulations, and New York environmental laws with respect to any building to be constructed at Westwoods (Stip. No. 53); (3) applied for or received permission from the Southampton Town Planning Board to engage in any activities at Westwoods in preparation for its development (Stip. No. 55); or (4) applied for or received any permit or approval from the Town for any activity conducted or to be conducted on any portion of Westwoods (Stip. No. 56). Prior to the summer of 2003, there had been publicized efforts by the Shinnecocks to develop Westwoods. (Defs. Ans. to Town

---

[36] Michael Benincasa is now the Chief Building Inspector for the Town. He testified that, before he did his 2003 physical inspection of Westwoods following the clearing of the land for the casino, he had never had any occasion to inspect anything at Westwoods or enforce zoning or building regulations at Westwoods because it was vacant property. (D364, at 51-52, 67.) He understood at the time of the inspection that Westwoods was zoned residential and advised the people present on the property that clearing the land was a violation of the Town Code, but he received no response. (D364, at 54-56.)

Compl., at ¶ 12.)

As discussed *supra*, the zoning classifications of the properties in the general vicinity of Westwoods are predominately residential. (Tr. 253.) Southampton has a Comprehensive Plan, which sets forth the Town's vision, goals, policies, and objectives regarding growth within the Town, and which sets forth where inhabitable land usage (residential, commercial, or industrial) should go, and which seeks to avoid incompatible land usage. (Tr. 233, 235-36.) Southampton's adoption of zoning laws and zoning designations is a mechanism by which the Town implements its Comprehensive Plan, and the zoning laws and designations must be consistent with the Comprehensive Plan. (Tr. 233-34.) Construction of a gaming casino at Westwoods would be inconsistent with the Comprehensive Plan. (Tr. 253-54.) There are no planning goals of the Town that would be satisfied by the construction of a casino at Westwoods. (Tr. 254.) The construction of a casino at Westwoods would be entirely out of character and inconsistent with the Comprehensive Plan. (Tr. 254.)

Chapter 325 of the Town Code contains the Town's wetland protection law. (T268.) In Southampton, the purpose of a wetlands permit is to ensure that any land disturbance or development that occurs in wetlands or within 200 feet of wetlands does not result in significant adverse impacts to wetlands. (Tr. 276-77.) Land disturbances or development within 200 feet of wetlands includes the clearing of natural vegetation, grading, excavation, placement of fill, building, structural changes, the installation of any man-made structure, planting, or landscape activities. (T268; Tr. 277-78.) The northern parcel of Westwoods contains or lies adjacent to wetlands, as the Great Peconic Bay system is regulated as wetlands under Chapter 325 of the Town Code. (Tr. 279-80.)

The Peconic Estuary, which includes the Great Peconic Bay, has been designated as an estuary of national significance by the United States Environmental Protection Agency. (Tr. 280.) Development on the northern parcel of Westwoods could implicate Chapter 325 of the Town Code. (Tr. 281.) Notwithstanding the Nation's stated intention to meet or exceed federal, state, and local environmental standards in connection with the development of a casino at Westwoods, the Nation admitted that no assessment or analysis had been done to determine whether it would be feasible to meet or exceed those standards in connection with a gaming facility at Westwoods. (Tr. 2886-88, 2947; D237, at 6.7; S248, at 193-94.)

## T. IMPACT OF CONSTRUCTION AND OPERATION OF A CASINO COMPLEX AT WESTWOODS

As set forth in detail below, based on the evidence at trial, the Court concludes that the construction and operation of a casino complex at Westwoods would disrupt the Town's governmental administration and the settled expectations of Southampton residents, and have disruptive environmental and traffic impacts in Southampton, as well as in Suffolk County generally.

### (1) FAILURE TO COMPLY WITH STATE ENVIRONMENTAL PERMITTING REQUIREMENTS

None of the defendants, nor any person or